**IOWA CENTER ASSOCIATES, an Illinois limited partnership, Plaintiff,**

v.

**Frederick O. WATSON and Watson Centers, Inc., Defendants.**

**No. 78 C 3364.**

United States District Court,
N. D. Illinois, E. D.

Sept. 19, 1978.

Bruce S. Sperling, Paul E. Slater, and Stephen J. Spitz, Sperling & Slater, Chicago, Ill., for plaintiff.

Terrence Hutton, Jenner & Block, Chicago, Ill., for defendants; John Mason, Dorsey, Windhorst, Hannaford, Whitney & Halladay, Minneapolis, Minn., of counsel.

## OPINION

BUA, District Judge.

The court conducted a hearing in this cause on September 14, 1978, to determine whether plaintiff should be granted a preliminary injunction, pursuant to Rule 65, Fed.R.Civ.P. It has taken detailed testimony from the parties and their witnesses. This testimony has uncovered a sharp disagreement between the parties, who are partners in a shopping center development, over the proper interpretation of their partnership agreement. The following are the court's findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Iowa Center Associates (ICA) is an Illinois limited partnership with its principal place of business at 601 Skokie Boulevard, Northbrook, Illinois. Gary R. Edidin, a resident of Glencoe, Illinois, is a general partner of the plaintiff limited partnership. ICA is one of several limited partners in a limited partnership known as Valley West D.M., which operates a shopping center in Des Moines, Iowa.

2. The defendants are the general partners of Valley West D.M.: Frederick O. Watson, a resident of Minnesota, and Watson Centers, Inc., a Minnesota corporation, with its principal place of business at 252 South Plaza Building, Gamble Center, Minneapolis, Minnesota.

3. The plaintiff and defendants are sophisticated real estate developers who negotiated their agreements in arms-length bargaining.

4. ICA became a limited partner in Valley West D.M. on January 1, 1975.

5. The present transaction is governed by the most recent partnership agreement, the "Third Amended Certificate and Restated Limited Partnership Agreement," effective as of December 31, 1977.

6. Under the agreement, ICA is a "special limited partner."

7. One of ICA's rights as a special limited partner is its entitlement under Article VIIIB of the agreement to the first $50,000 of cash flow from the Valley West D.M. partnership each year, not counting certain specified exceptions.

8. On April 20, 1978, Valley West D.M. entered into a joint venture agreement with the Post Office Staff Superannuation Fund (POSSF), creating a joint venture under the laws of Illinois to be known as "POSSF-Valley Venture." This joint venture was amended by a letter agreement dated August 29, 1978.

9. Under the terms of the amended agreement, POSSF has made a $3,250,000 "capital contribution and loan" to Valley West D.M. This consists of a capital contribution of $100,000, and a second mortgage of $3,150,000. In the resultant joint venture, both POSSF and Valley West D.M. have one-half interests in the property formerly held by Valley West D.M. The POSSF-Valley Venture leases the shopping center back to Valley West D.M., which operates the shopping center for the joint venture.

10. The August 30, 1978 settlement sheet for this transaction, (DX4), and the testimony indicate that $2,523,333.30 of this money was used to pay off a temporary second mortgage, $428,466.45 was sent to the POSSF-Valley Venture, (as administered by the defendants), to create a reserve to be used for expenses, and the remainder was used to pay various expenses of the transaction. Of the money sent to POSSF-Valley Venture, about $200,000 is now left to be used as a reserve for future expenses.

11. In the near future, Valley West D.M. expects to receive $2,500,000 in additional money from Massachusetts Mutual Life Insurance Co., the first mortgagee. This money is the final funding of the first mortgage on the shopping center. The defendants intend to distribute the $2,500,000 in the following ways: (a) $500,000 to buy a certificate of deposit, which will be issued to and held by POSSF as security for its loan for a specified period; (b) $500,000 to pay off outstanding loans made to Valley West D.M. by the general partners; and (c) $1,500,000 to be distributed to the partners under Article VIIIA of the partnership agreement.

12. The defendants claim that the intended distribution will be proper under the agreement. They contend that the propriety of the distribution is supported by an equitable entitlement to the money, as the proceeds of their sale of half of their interest in the shopping center. They have chosen to structure this sale to include a mortgage for business and tax reasons.

13. The plaintiff claims that the intended distribution will prejudice its rights to the $50,000 cash flow preference. In borrowing $3,150,000 from POSSF and $2,500,000 from Massachusetts Mutual, Valley West D.M. will have to pay the interest on, ("service"), $3,150,000 more dollars than under the mortgage agreement with IDS. This additional servicing charge will cost Valley West D.M. approximately $200,000 each year.

14. Valley West D.M. is currently operating at about the break-even point. Assuming that all other income and expenses remain the same, Valley West will lose

$200,000 each year under these agreements, unless it leases additional space in its shopping center or increases its rents.

15. In addition to the added servicing charge, certain tenant improvement expenses can be anticipated in connection with the leasing of new space in the shopping center. About 60,000 square feet remain to be leased. Mr. Edidin, general partner of plaintiff ICA, testified that $10 per square foot, based on his extensive experience, would be a fair estimate of average shopping center tenant improvement costs. Richard Weigel, Vice President of defendant Watson Center, testified that the cost for the space that was actually leased in the past year averaged $2.20 per square foot.

16. Defendants intend to cover any losses by exhausting the $200,000 that remains in the reserve set up by the POSSF agreement. If necessary, they will then borrow additional money from the general partners.

17. Plaintiff claims that the added servicing expenses of the new loan transactions, combined with the tenant improvement expenses and other costs, will act to defeat its preference on the cash flow generated by the shopping center. These loans will have priority over the plaintiff's preference on the first $50,000 of the cash flow. Thus, the plaintiff claims that the current equity and debt of Valley West is being converted to future expenses.

18. All findings of fact deemed to be conclusions of law are hereby adopted as conclusions of law, and all conclusions of law deemed to be findings of fact are hereby adopted as findings of fact.

## CONCLUSIONS OF LAW

A. This court has jurisdiction over the subject matter of this case due to the diversity of the parties and the fact that the amount in controversy exceeds $10,000. 28 U.S.C. § 1332. Jurisdiction for declaratory relief is provided by 28 U.S.C. § 2201.

■ B. This court has jurisdiction over the persons of the defendants. The presence of defendants (or their agents) in Illinois on two occasions in negotiating these transactions, together with the numerous oral and written communications on these transactions with the Illinois plaintiff, provides a basis for the Illinois courts to have personal jurisdiction over the defendants, satisfying all constitutional and statutory tests. *See Scovill Manufg. Co. v. Dateline Elec. Co.*, 461 F.2d 897 (7th Cir. 1972). Consequently, this court, sitting in a diversity case, has jurisdiction over the persons of the defendants.

C. Venue is founded on 28 U.S.C. § 1391(a), in that this is the judicial district where the sole plaintiff resides.

D. As provided in Articles I and XXI, the laws of Minnesota govern the interpretation of the partnership agreement.

■ E. The present action is, *inter alia,* for breach of fiduciary duty, breach of the partnership agreement, and fraud, and is analogous to an action for an accounting. Such an action can be maintained without dissolution of the partnership under the Uniform Limited Partnership Act, as adopted by Minnesota. *See* M.S.A. §§ 322.09–322.10, 323.20–323.21; Note, *Procedures and Remedies in Limited Partners' Suits for Breach of the General Partner's Fiduciary Duty,* 90 Harv. L. Rev. 763, 783–89 (1977).

■ F. Since actions for breach of fiduciary duty and for an accounting of a partnership agreement, *see Maras v. Stilinovich,* 268 N.W.2d 541, 544 (Minn.1978), are equitable actions, the full range of the court's equitable powers, including the granting of a preliminary injunction to preserve the status quo, may be used. *See generally, Jones v. Schellenberger,* 201 F.2d 29 (7th Cir. 1953), *rev'd and remanded on other grounds,* 225 F.2d 784 (7th Cir. 1955).

G. Under Minnesota law, a general partner owes a fiduciary duty to a limited partner. M.S.A. §§ 322.09, 323.20–323.21. "[T]he relationship between partners is essentially one of mutual trust and confidence and . . . the law imposes upon them the highest standard of integrity and good faith in their dealings with each other."

*Lipinski v. Lipinski,* 227 Minn. 511, 35 N.W.2d 708, 712 (1949); *Venier v. Forbes,* 223 Minn. 69, 74, 25 N.W.2d 704, 708 (1946).

H. In deciding this case, the court is following the general principle applied to an action for an accounting under Minnesota law, by exercising "its powers to find the most advantageous plan which will not prejudice the rights of either party." *Maras v. Stilinovich,* 268 N.W.2d at 544.

I. The resolution of this dispute is governed by the Third Amended Certificate and Restated Limited Partnership Agreement. The applicable portion of the agreement is Article VIIIA:

The general partners shall determine and distribute the excess net cash receipts, if any, of the Partnership for each fiscal year. The general partners may determine, in their absolute discretion, to make advance distributions on a monthly, quarterly, or any other basis. The term "excess net cash receipts of the Partnership" as used herein shall mean net income derived from the operation of the Partnership as determined under the cash receipts and disbursements method of accounting applied on a consistent basis, except that . . . (c) net cash proceeds of any financing . . . shall be considered as net receipts, and (d) if the general partners shall so determine, a reasonable reserve shall be deducted for working capital needs, or to provide funds for improvements or for any other business purposes or contingencies of the Partnership, which reserve shall also be taken into account in the determination of excess net cash receipts of the Partnership; provided, however, that as to the special limited partner, excess net cash receipts shall not include loans made to the Partnership by POSSF, or by any other joint venturer . . . to the extent received by the Partnership prior to January 1, 1980 . . . .

J. In order to determine the likelihood of the plaintiff prevailing in this action, it is necessary to construe the agreement between the parties.

K. The Third Amended Certificate and Restated Limited Partnership Agreement is, as evidenced by Article XXI, an integrated contract. It is therefore possible to construe the contract without reference to any parol evidence offered by the parties.

■ L. This court holds that the provision in Article VIIIA which authorizes the general partners to distribute excess net cash receipts is limited by clause (d), which states that

if the general partners shall so determine, a reasonable reserve shall be deducted for working capital needs, or to provide funds for improvements or for any other business purposes or contingencies of the Partnership, which reserve shall also be taken into account in the determination of excess net cash receipts of the Partnership . . . ."

M. Clause (d) requires the general partners to maintain a reasonable reserve to cover the specified purposes.

N. Conclusion M is supported by the general fiduciary duty of defendants as general partners. *See* Conclusions F–G, *supra.* Any other result would permit the defendants to dispense with a reasonable reserve and, in effect, give them license to raid the Valley West D.M. partnership and withdraw funds necessary to its business operations. If clause (d) were construed to allow a raid of Valley West D.M. partnership funds, it would permit the general partners to ignore their fiduciary duty "of mutual trust and confidence and . . . the highest standard of integrity and good faith," *Lipinski v. Lipinski,* 35 N.W.2d at 712; *Venier v. Forbes,* 25 N.W.2d at 708.

O. Conclusion M is also supported by the language of Article VIIIA. Clause (d) states that a reasonable reserve will be set up "if the general partners shall so determine . . . ." Earlier in Article VIIIA, the partners are authorized to "determine, in their absolute discretion," whether advance distributions of the excess net cash receipts can be made. The parties, by that language, demonstrated that they knew how to use language to commit a decision to the absolute discretion of the general part-

ners, when they thought that absolute discretion was appropriate. Their failure to use such language indicates that the general partners' discretion in setting up a reserve for anticipated expenses was not meant to be absolute, but was meant to be limited by their general fiduciary duty.

■ P. Plaintiff has no adequate remedy at law. In order to achieve similar results, he would be forced to rely on a continuing series of lawsuits. Prospective monetary relief would be speculative. Relief might be thwarted by the contemplated distribution of the proceeds of the challenged transactions to the various members of the limited partnership. Furthermore, as noted above, equity traditionally takes jurisdiction over breaches of fiduciary duty, and actions in the nature of an accounting. *See generally* C. Wright & A. Miller, Federal Practice and Procedure: Civil § 2944 (1973).

Q. Plaintiff would suffer irreparable injury if relief were not granted. In addition to the conclusions stated in Conclusion P, the court relies on the testimony of Mr. Weigel that defendants might have to default in certain unrelated transactions if they would not receive the proceeds of the current transaction. Such an admission of the relatively weak status of defendants' finances provides a strong indication that if defendants proceed to strip Valley West D.M. of all cash reserves, they might be unable to meet future cash needs, and further irreparable injury to the plaintiff might result.

R. The plaintiff has demonstrated a high probability of success at trial.

S. The balancing of hardships favors the granting of an injunction, particularly considering the fact that the denial of a preliminary injunction, and the consequent distribution of assets, might thwart the court's ability to maintain the status quo until a final determination of the merits is made. *See generally* Wright & Miller, Civil § 2948.

T. Based on the evidence before the court, the court concludes that a reserve of $500,000 will be adequate to cover anticipated expenses of Valley West D.M.

■ U. Under Rule 65(a)(2), the evidence taken at the preliminary injunction hearing is automatically admissible at trial. Thus, even though these findings of fact and conclusions of law are not binding at trial, a significant change in the record would be necessary to persuade the court to reach a different conclusion. *See cases collected in* Wright & Miller, Civil § 2950.

V. Pending any trial, the court will consider submissions from either side which will demonstrate that the reserve set by the court is too high or too low.

ACCORDINGLY, defendants Frederick O. Watson and Watson Centers, Inc., are hereby enjoined and restrained from distributing to the members of the Valley West D.M. Partnershi₁ during the pendency of this trial the proceeds of the Massachusetts Mutual and POSSF transactions beyond the amount needed to maintain a reserve fund of $500,000. In computing the $500,000, the defendants may include the approximately $200,000 currently included in the reserve fund, and need only retain approximately $300,000 of the proceeds of the two transactions. The defendants may pay out normal business expenses, including the interest on loans, from this fund, and such payments may be allowed to deplete the fund below $500,000.