Charles S. **FOLTZ, et al., Plaintiffs,**

v.

**U.S. NEWS & WORLD REPORT, INC., et al., Defendants.**

**Civ. A. No. 84–0447.**

United States District Court, District of Columbia.

March 28, 1985.

**1334**

Alan Raywid, John D. Seiver, Susan P. Baxter, Cole, Raywid & Braverman, Washington, D.C., for plaintiffs Foltz, Handleman, Price, Williamson.

Richard J. Leighton, Avis Black, Washington, D.C., for Save the Fund.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Washington, D.C., for defendants U.S. News, Madana Realty.

Lawrence Latto, William Galeota, Julie Melamud, Shea & Gardner, Washington, D.C., for Profit-Sharing Plan.

Richard J. Wertheimer, Hadrian Katz, Edward Wolf, Washington, D.C., for defendants Sweet, Stone, Dunn, Keker.

Willis B. Snell, Willard K. Tom, Steuart H. Thomsen, Washington, D.C., for defendant The American Appraisal Co.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

### INTRODUCTION

This class action litigation arises from the sale of the defendant U.S. News and World Report, Inc. ("U.S. News") in October of 1984. The shareholders of this employee-owned company realized $176 million from the sale in return for their interests in the company. The $176 million sales price represented a value approximating $3,000 per share of the company's outstanding stock. At the time of the sale, the employee-shareholders, including the individual defendants in this proceeding, liquidated their interests in U.S. News at this value.

The plaintiffs in this class action represent all former employee-shareholders of U.S. News who retired or otherwise terminated their employment between 1974 and 1981. When they left the employ of the company, these individuals liquidated their stock and profit-sharing interests in U.S. News at values established by annual appraisals conducted by defendant American Appraisal Associates, Inc. ("American Appraisal"). The plaintiffs assert that those appraisals were flawed, improperly developed and not in accordance with accepted procedures, which resulted in gross deficiencies in the amounts they received for their interests in the corporation. They also allege that the present employees who received the sale proceeds benefited from the undervaluation during the 1974-1981 class period.

The defendants are U.S. News and its wholly-owned subsidiary, Madana Realty, American Appraisal, and the Profit-Sharing Plan of U.S. News ("Plan"), an employee benefit plan whose members are current and recently retired employees of U.S. News. Eight individuals have also been named as defendants—John Sweet, Marvin Stone, William Dunn, Samuel Keker, Lester Tanzer, John Touhey, Raymond Naimoli, and James McIlhenny. They served on the Board of Directors ("Board") of U.S. News during the relevant time period.

The plaintiffs allege in their Fourth Amended Complaint that the defendants breached their fiduciary obligations by deliberately and knowingly undervaluing the

stock of the corporation. Specifically, they allege that the defendants (1) utilized discriminatory appraisal procedures and wrongfully manipulated appraisal values; (2) withheld or undervalued corporate real estate holdings; (3) diluted the potential interests of the class members through self-dealing. and issuing substantial amounts of phantom stock to members of the Board; (4) operated and conducted U.S. News' affairs in such a manner as to conceal their improper conduct and the true value and worth of the plaintiff class members' interests. They charge the defendants with common law fraud, fraudulent concealment, breach of fiduciary duties, gross negligence, violations of federal securities and antitrust laws, and violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*

The matter is presently before the Court on the plaintiffs' application for an order preliminarily enjoining and restraining the Profit-Sharing Plan and U.S. News from distributing the lion's share of the proceeds of the sale, pending the outcome of this litigation.[1] The Plan received approximately $135 million from the proceeds of the sale. As of the end of 1984, the assets of the Plan equalled approximately $138.5 million, including interest on short-term investments. U.S. News also holds certain assets in the form of payments due on notes held by six of the individual defendants, payable over 15 years. These debt obligations represent the deferred compensation owed to these defendants.

In January 1985, counsel for the Plan notified the Court and the parties to this proceeding that it would honor requests of Plan members for a full or partial distribution of their account balances, effective March 31, 1985. The plaintiffs responded to this announcement by filing a motion for a preliminary injunction seeking to enjoin all disbursements by the Plan and U.S. News.

After considering the legal memoranda, supporting affidavits, extensive exhibits, and the oral argument of counsel for the parties, the Court determines that the plaintiffs have not sufficiently satisfied two of the stringent criteria that are a predicate to the extraordinary relief they seek. They have failed to demonstrate that they will sustain irreparable harm and injury in the absence of injunctive relief at this time. Nor have they satisfactorily responded to the concerns and questions presented by the present employee-shareholders who have lawful claims to the remaining undistributed proceeds from the sale, and who are not charged with any wrongdoing. Accordingly, the plaintiffs' motion for a preliminary injunction is denied. The reasons for this determination are set forth below.

## FACTUAL BACKGROUND

A brief review of the types of interests possessed by U.S. News' employees is helpful to an understanding of this litigation. Beginning in the early 1960's, U.S. News rewarded its employees for their services with two types of stock-related interests: a proportionate share of the value of the stock held in the Plan, and bonus or anniversary stock. The class members received payments for these interests upon termination or retirement. Following the 1984 sale, the current U.S. News' employees also received payments representing the value of each of these interests. The plaintiffs do not directly seek any preliminary relief against payments for bonus stock; those funds have already been dispersed. However, since both interests are relevant to the plaintiffs' claim for damages, they deserve some discussion.

### A.

### STOCK INTERESTS

*Bonus Stock*

U.S. News' employees received awards of common stock, known as bonus or anni-

---

1. The remaining sale proceeds have been distributed to the employees as payment for bonus stock. These interests are distinct from the employees' respective interests in the Plan, and are discussed *infra* at 1335.

versary stock, at five-year intervals. The amount of stock issued was based on the employees' salary and length of employment. Upon termination, retirement or attaining the age of 65, the employees were required to sell this stock back to the company. The bonus stock was valued by American Appraisal on the same basis as the shares of stock held by the Plan. The value of the two types of interests was thus identical in any given year.

### Profit-Sharing Plan

In 1962, U.S. News was reorganized for the purpose of transferring the beneficial ownership and management of the corporation to its employees. After the reorganization, the company maintained an existing profit-sharing trust or plan, whose assets included 30,000 shares of Class A stock of the corporation, later increased to 50,000 shares. The Class A stock had full voting rights. Since the reorganization, the value of the stock has been based on an annual appraisal rendered by American Appraisal.

The Plan was managed by a Profit-Sharing Committee, whose members were appointed by the Board of Directors. Board members frequently served as members of the Profit-Sharing Committee. All of the individual defendants, with the exception of Tanzer and Tuohey, were members of the Committee at some point during the relevant period.[2] Each employee's interest in the Plan was based on his proportionate share of the value of the Plan assets. An employee was required to liquidate his interests in the fund upon retirement or termination of his employment with U.S. News, either immediately or proportionately over a 10-year period.

In 1967, U.S. News placed the Plan's stock in a voting trust, which was governed by six trustees. The trustees were chosen from among the principal officers and department heads of the company. Since the voting trust stock represented a majority of the corporation's outstanding stock,

these trustees retained majority control of the corporation. Membership on the voting trust also overlapped with membership on the eight-member Board of Directors.

### Phantom Stock

In addition to bonus stock awards and interests in the Profit-Sharing Plan, the members of the Board and certain senior employees also received deferred compensation in return for their expected services. This executive "perk," known as phantom stock, did not represent actual ownership rights in the corporation. Instead, it represented a contingent promise that U.S. News would pay sums measured by the value of its stock at the time the holder retired, died or became disabled, or in the event the company was sold. These rights were referred to as phantom stock because their value was equal to the value of regularly-issued stock.

The phantom stockholders liquidated their interests when U.S. News was sold, based on a value of approximately $3,000 per share. In actuality, U.S. News gave each holder a 15-year corporate note in return for his deferred compensation claim. U.S. News will satisfy its obligation on the notes by 60 quarterly payments over this period. *See* discussion *supra* at 3. Thus far, the phantom stockholders have received one quarterly payment, and a second payment is due shortly.

## B.

### APPRAISAL METHODOLOGY

All of the plaintiffs' claims for relief are based on the allegation that they liquidated their stock and profit-sharing interests in U.S. News at grossly undervalued rates developed and provided by the defendants. To establish their entitlement to damages, the plaintiffs must prove that U.S. News stock was undervalued during the class period and that the undervaluation resulted from various violations of law

---

**2.** After the sale, U.S. News relinquished nearly all of its control over the Plan Committee, retaining only the right to select one of the four members of the Committee. Amended Plan Document, Art. 18.1, 21, 23.1, attached as Ex. A to the Memorandum of the Plan, filed Feb. 20, 1985.

and breaches of fiduciary duty by the defendants. Thus, the underlying data utilized in the appraisals and the appraisal methods themselves are central factors in this case.

The starting point for the analysis of the issue is provided by the U.S. News' Articles of Incorporation. Section e of the Fifth Article provides that the parties shall reach an agreement concerning the fair market value of the stock, and in the absence of such an agreement, the value will be determined by an annual appraisal conducted by a "qualified appraiser of national standing." Px 2 at 9.[3] The record shows that U.S. News bypassed the provision calling for such an agreement, and instead, employed and relied upon the services and opinions of American Appraisal in determining the value of the stock.

In connection with these annual appraisals, U.S. News routinely furnished American Appraisal with necessary financial information and other supporting data at the beginning of each year. American Appraisal then conducted interviews of U.S. News' managers, and announced the fair market value of the stock by the end of March. Finally, a report would be prepared which explained the basis for the appraisal. U.S. News utilized this information in calculating the bonus stock awards and purchasing the stock interests of employees who left the company during the following year.

In turn, these figures were transmitted to the Plan Committee. The Committee based its valuation on Paragraph 6.3 of the Plan document, which specifically provides that

> For all purposes of the Plan, the market value of shares of stock of the Employer, which are held by the Trustee as a part of the Fund, shall be the fair market value established under Article Fifth, Paragraph (e), of the Certificate of Incor-

poration of U.S. News & World Report, Inc.

Px 6 at 13. The Committee then disbursed benefits to the employees according to their proportionate interests in the assets of the Plan.

The plaintiffs raise five major challenges to the conclusions which formed the basis for the liquidation of their interests: failure to properly value U.S. News' significant real estate holdings, improper application of a marketability discount to reflect the fact that the stock was owned by a closely-held corporation, valuation of the stock on a minority basis rather than on a control premium basis, the inclusion of certain items as liabilities, and manipulation of the appraisals to match certain predetermined values fixed by U.S. News. Some of these accusations are directed at American Appraisal, others involve the complicity of U.S. News and the individual defendants. The remainder charge that the Board either negligently or intentionally concealed information which was necessary to accurately value the stock.

These assertions are supported by affidavits filed by the plaintiffs' designated expert witnesses: John Hempstead and William Harps. Each has impressive credentials and a wide range of experience.

Mr. Hempstead was retained to conduct an independent appraisal of the value of U.S. News' stock between 1973 and 1980, and to critique the appraisals rendered by American Appraisal. His preliminary conclusions are subject to certain reservations; specifically, a review of independent real estate appraisals which are not yet available, as well as the consideration of certain economic and financial factors applicable to the appraisal years. Hempstead Aff. at ¶¶ 33–34, filed (under seal) Feb. 11, 1985.

William Harps was engaged to appraise the value of U.S. News' real estate holdings between 1973 and 1981. He indicates that his preliminary estimates will be re-

---

**3.** Unless otherwise noted, the record citations are to the exhibits filed by the plaintiffs on March 7, 1985, in support of their motion for a preliminary injunction. References to exhibits used in depositions are cited as "Px," additional exhibits are cited as "Ex," and deposition extracts are cited as "Dep."

fined in a final appraisal of the market value of the property owned by U.S. News during the relevant period. Harps Aff. at ¶¶ 12–13, filed (under seal) Feb. 11, 1985.

U.S. News and American Appraisal have countered with the Affidavit of Michael Megna, a vice president of American Appraisal. Megna Aff., filed Feb. 20, 1985. Mr. Megna's affidavit likewise reveals considerable experience in valuing corporate stock and conducting corporate appraisals.

At this point in the proceedings, the state of the record does not permit or justify any definitive or final conclusions. The three experts have advanced preliminary conclusions which are subject to refinement and may well change before a trial on the merits. Additional discovery will also help to clarify additional areas of concern. After considering these caveats and carefully canvassing the available evidence, the Court concludes that the allegations of undervaluation of the real estate holding are especially relevant and material. The plaintiffs' challenge to the use of a discount for limited marketability also merits consideration.

*Real Estate Valuation*

The analysis of the plaintiffs' experts begins with a 1969 real estate appraisal. At that time, Charles Koones, an independent appraiser, appraised the real estate at a value of $6.4 million. The 1970 American Appraisal report followed Koones in appraising the real estate at a value of $6 million. Since no appraisals were conducted between 1971 and 1973, it is impossible to ascertain the weight American Appraisal assigned to these assets during that period. The records of payments to individuals, however, show U.S. News' opinion about the value of its stock.

In 1974, zoning changes applicable to U.S. News' real estate holdings increased the potential for development of the property. The 1974 appraisal report does not detail the value of the real estate holdings, but mentions that it is "largely unchanged except for depreciation charges." Px 125 at 5.

Between 1975 and 1977, American Appraisal specified the value of U.S. News' land holdings in its annual appraisal of the company's stock. The 1975 report stated that real estate values had increased "due to recent assessed values," but did not indicate how this value was derived. Px 14 at 11. In determining the value of stock in 1976 and 1977, the appraisals included the value of U.S. News' real estate which was excess to its business operations. One appraiser has indicated that this "excess" was informally determined through conversations with U.S. News' personnel. Donald Smith Dep. at 162.

In 1978, real estate values were once again omitted from the annual appraisal. These assets reappeared in 1979 and again in 1980, the last appraisal on which the class members' interests were liquidated. Only excess real estate contributed to the fair market value of the stock. These amounts were $1.5 million and $1.9 million, respectively.

During this same time period, the corporation was actively pursuing development possibilities. In the mid-70s, U.S. News hired the Oliver T. Carr Company to study its land holdings and recommend development strategies. In 1976, Carr submitted a study which proposed the development of all of U.S. News' property. U.S. News sought additional advice on land development from Arnold & Porter in 1980, and then hired Julien Studley & Company to conduct an appraisal. In late 1980 or early 1981, Studley estimated that the one-half of the property available for commercial construction was worth at least $320 per square foot, while the remainder, available for residential construction, was worth $180 per square foot. An Arnold & Porter memorandum indicates that "the value of $320 per foot for office land is substantially higher than the approximate $132 per foot used in discussions with the Oliver T. Carr organization in early 1980." Px 82 at 5. The memorandum concludes that "[w]e believe that either a sale or a joint venture should be feasible on terms consistent with the above valuations." *Id.* at 6. In 1981, U.S. News formed a joint venture with

Boston Properties to develop the company's real estate. Px 21 at 6.

Prior to the 1981 appraisal, the record strongly suggests that the substance of U.S. News' development activities was never submitted to American Appraisal. According to David Marshall, who prepared the 1978–1980 reports for American Appraisal, although Mr. Sweet told him that U.S. News was "sitting on a gold mine," Marshall Dep. at 475; *see* Px 77 at 5383, U.S. News did not disclose the Carr study, the Studley appraisal, or the Arnold & Porter summary. *Id.* at 496–98, 503, 622–23. Marshall testified that this information would have been relevant to the stock appraisals. 496–502, 506, 624–27. Mr. Naimoli, a member of the Board and a defendant in this action, has stated that he offered Marshall a copy of the Arnold and Porter summary. Naimoli Dep. at 227–29.

The 1981 appraisal by American Appraisal reflects that these development plans substantially increased the value ascribed to U.S. News' land holdings. A major portion of this increase results from differing interpretations about the land available for development in various years. For instance, the 1980 appraisal found that the land available for development—the land excess to business—was worth $4.6 million, Px 20 at 13, and only a discounted value of $1.9 million was included in valuing the stock. In contrast, the 1981 appraisal showed an estimated $37.5 million value for all of U.S. News' real estate holdings included in the joint venture, discounted to a net value of $16 million. Px 21 at 22, 27.

The significance of these development plans to the value of U.S. News' real estate holdings is illustrated by a comparison of the per square foot values assigned by American Appraisal in 1980, and the estimates prepared by Julien Studley in the same year. American Appraisal calculated the value of the real estate at $140 per square foot, Px 20 at 13; Notes, Px 95 at 4, while Studley estimated the value of the land in a range between $180 and $320 per square foot, depending on the use of the property. The significance of this exponen-

tial increase in the land values is also reflected in American Appraisal's valuation of U.S. News' stock. The per share value tripled from $152 in 1980, Px 20 at 14, to $470 in 1981. Px 21 at 31. If the higher real estate values had been incorporated in the stock appraisals earlier, they would have had a significant impact on the value of the employees' stock interests.

*Marketability Discount*

American Appraisal applied a variety of discounts to the values it determined for U.S. News' stock. For instance, these values were discounted to reflect the limited market for the shares of stock of a close corporation such as U.S. News. American Appraisal's expert has asserted that while "[t]he appropriate discount depends upon the circumstances peculiar to a particular stock," Megna Aff. at ¶ 19, "marketability discounts should always be at least 10%." *Id.* at ¶ 20. The plaintiffs contend that any marketability discount was inappropriate because U.S. News retained the option to repurchase these shares, an option which it unfailingly exercised every year. Thus, a ready resale market was always available for the shares.

At least one authority would appear to favor the plaintiffs' view. *See* Pratt, S., *Valuing a Business: The Analysis and Appraisal of Closely-Held Companies* (1981). Pratt discusses the appropriateness of a marketability discount for shares held by an employee stock ownership plan (ESOP). Pratt concludes that although a marketability discount is usually appropriate, where

> some companies have a policy of redeeming ESOP shares for cash when tendered, ... where management indicates an intention to continue such a policy, and where the company's financial position appears capable of supporting it, it would seem that a zero marketability discount would be justifiable.

*Id.* at 342. Although the Plan is not an ESOP, the parties apparently agree that the two entities are similar enough that an analogy between the two is appropriate. *See* Supplemental Memorandum of Ameri-

can Appraisal at 2 n. 1, filed March 13, 1985.

## C.

### DAMAGE CLAIMS

The plaintiffs' claim for millions of dollars in damages is the centerpiece of this motion, and the basis for their claim of irreparable injury. An inverse relationship exists between the damages claimed and irreparable injury: the greater the potential damage award, the greater the potential for irreparable harm. In essence, the plaintiffs assert that the potential damage award is so large that the defendants should be required to maintain a pool of funds to ensure that the class will actually recover any damages awarded at trial. Accordingly, the Court must examine the plaintiffs' damage estimates and the basis for these calculations.

The anticipated damages are summarized in a document which estimates the undervaluation of the plaintiffs' bonus stock and profit-sharing plan interests. Damage Summary and Tables I–IV, filed Feb. 11, 1985. The plaintiffs provide two separate damage figures in the summary: one set based on the assumption that the issuance of phantom stock was invalid, and a lower set based on the assumption that the issuance of phantom stock was valid. The phantom stock is relevant because those "shares" increased the number of interests over which the sale proceeds were divided. The greater the number of outstanding shares, the less each shareholder received for his interest in U.S. News. As a matter of arithmetic, any payments on the phantom stock shares would lessen the value of both the plaintiffs' and the current employees' interests in the company.

The plaintiffs also present potential estimates of their recovery from the bonus stock and profit-sharing transactions. Assuming the phantom stock payments were invalid, they estimate that their bonus stock claims were undervalued by $10.6 million and their profit-sharing claims by $35 million. After multiplying these figures by a prejudgment interest rate based on the average yield on long-term corporate bonds in each year since 1975, and adding the two totals, the plaintiffs assert damage claims equalling $98 million. The damage estimate is reduced to $83 million if lower interest rates, based on 90-day treasury bills, are utilized.

The defendants, particularly the Profit-Sharing Plan, argue that the plaintiffs' damage estimates are grossly inflated. The Plan asserts that these claims are based on invalid assumptions about the potential for recovery of the claimed damages from the Plan assets, the appropriateness of a control premium or majority control analysis, the interrelationship of damages between the various class years, and the proper method for calculating interest, if in fact an award of prejudgment interest is appropriate. *See* Memorandum of Profit-Sharing Plan at 13–27. In sum, the Plan concludes that any damages awarded in this litigation against the Plan could not exceed $12 million.

In order to resolve the present motion, the Court need not fix the elements or amount of damages to which the plaintiffs would be entitled. The point is that extraordinary prejudgment relief is sought against the Plan and its beneficiaries, whether the plaintiffs seek to restrain the distribution of $12 million or $98 million. Although the plaintiffs have thus far presented an intriguing case on the merits, the relevant case law does not support the equitable relief which they now seek.

### LEGAL ANALYSIS

The traditional factors governing the issuance of a preliminary injunction are: the likelihood of success on the merits, the possibility that the plaintiffs will suffer irreparable injury in the absence of equitable relief, the balance of hardships between the parties, and the public interest. *See Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977); *Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958).

## A.

### IRREPARABLE INJURY

■ In this proceeding, the plaintiffs ultimately seek money damages in satisfaction of their claims. But before trial on the merits, they request the Court to preserve in escrow a pool of existing assets for their benefit. This requested relief will disturb the status quo, and thus imposes a very heavy burden on the plaintiffs to demonstrate that they will suffer irreparable harm in the absence of such relief.

■ A party who sues for money damages must overcome a very strong presumption that equitable monetary relief in advance of trial is inappropriate. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 828 (D.C.Cir. 1984) (citing *Sims v. Stuart*, 291 F. 707 (S.D.N.Y.1922) (J. Hand)). The *Sims'* Court flatly refused to issue an injunction to "hurry [a claim for money damages] along by granting final relief at the outset of a cause," and indicated that such equitable relief would never be appropriate. *Sims*, 291 F. at 707–08 (citations omitted).

■ This Circuit has affirmed the viability of *Sims* and its progeny, stating that "we have no quarrel whatever with *Sims'* result." *Lockheed Aircraft Corp.*, 746 F.2d at 829. Nevertheless, this Circuit has recognized that equitable intervention of this sort is appropriate in two situations. The court may order the defendant to create a pool of funds for the benefit of the plaintiffs after the defendants' liability has been adjudicated. *Id.* Once liability has been determined, there is less danger that the court will invade the province of the trier of fact. At this point, the only issue remaining for the trier of fact is the amount of damages. The issuance of an injunction under such circumstances

> reflects a common-sense notion of fairness that undergirds equity jurisprudence: it is more just that a defendant already adjudged liable bear the risk that an interim computation of damages will be fixed too high by the court than to

have the plaintiff bear the risk of receiving damages too late to be of any use. *Id.*

The Court also noted that interim equitable relief may implement remedial steps which are necessary to "prevent serious irreparable injury." *Id.* at 830 (citing *United States v. Price*, 688 F.2d 204, 212 (3d Cir.1982) (creation of a fund for diagnostic study of environmental hazards to city's water supply)). A set aside of funds for this purpose does not assess compensatory damages against the defendant for past injuries. Instead, this set aside serves as an equitable means to prevent future irreparable injury to the plaintiffs. The *Lockheed* Court adopted this rationale in approving the creation of a fund to cover the cost of diagnostic examinations for Vietnamese orphans. *Id.*

At first glance, the posture of the *Lockheed* case appears distinguishable because the relief ordered is not identical to the relief sought here. The plaintiffs in this case seek to restrain payments from an already-existing fund, while the *Lockheed* plaintiffs sought the creation of a fund from which payments could be made. This is a distinction without a significant difference. Although the employee-shareholders do not ask for the immediate use of the fund's assets, they wish to encumber other individuals' access to these assets. The same result would follow if the Court permitted distributions from the Plan, and then ordered each of the Plan beneficiaries to reserve the amounts received. Thus, the *Lockheed* analysis is relevant to the plaintiffs' request for a preliminary injunction.

■ The plaintiffs do not meet either of the exceptions to the general rule articulated in *Lockheed* that monetary relief in a legal action may not be ordered prior to a final determination of liability and computation of damages. Here, not only must the trier of fact ascertain the amount of damages owed the plaintiff, but it must first decide whether the plaintiffs' interests in U.S. News were in fact undervalued in any amount during the years in question. Nor do the assets of the Plan represent a

remedial source of funds to prevent future injury. The purpose of the requested injunction is not remedial because it will not assist the trier of fact in resolving the question of damages. It will not even be tapped until *after* the litigation concludes. Instead, its sole purpose is to provide a pool of funds from which an ultimate judgment may be satisfied. In short, the plaintiffs want to preserve a pool of funds to guarantee a damage recovery, prior to a determination of liability by entry of summary judgment or otherwise. This they may not do.

Precedent from other jurisdictions is also relevant to the plaintiffs' claim of irreparable harm. While several distinctive fact patterns are presented, all of these courts enjoined the disbursement of assets so as to ensure an available source of funds from which subsequent damages could be satisfied. This authority goes beyond *Lockheed* in permitting non-remedial relief prior to an adjudication of liability.

One group of cases involves situations where courts have frozen certain assets which the defendants were likely to remove from the jurisdiction. *See USACO Coal Co. v. Carbomin Energy, Inc.,* 689 F.2d 94 (6th Cir.1982) (action under Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ); *Productos Carnic, S.A. v. Central American Beef and Seafood Trading Co.,* 621 F.2d 683 (5th Cir. 1980); *International Controls Corp. v. Vesco,* 490 F.2d 1334 (2d Cir.), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974). In these cases, the court had reason to believe that certain assets would be irretrievably transferred to foreign jurisdictions or enterprises. The Court relied on findings that the deposed Nicaraguan President—General Somoza—had removed substantial assets from the United States and intended to secrete others which were the subject of the litigation, *Productos Carnic, S.A.,* 621 F.2d at 685–86, and that domestic corporations were controlled by foreign nationals who had engaged in questionable activities in connection with the litigation. *USACO Coal Co.,* 689 F.2d at 97–98. Likewise, the court affirmed the

issuance of an injunction involving a yacht owned by Robert Vesco, whose "pervasive presence" in a securities action revealed "multifarious financial manipulations ... of astonishing intricacy." *Vesco,* 490 F.2d at 1338. The court expressed deep concern that Vesco's ties with the Bahamian government might put him "beyond the reach of the court," and agreed that permitting the yacht to leave the country would constitute irreparable harm. *Id.* at 1354.

Courts have also enjoined the dissipation of assets which realistically were the only assets available to satisfy a future judgment. *See, e.g., Lynch Corp. v. Omaha National Bank,* 666 F.2d 1208 (8th Cir. 1981); *Iowa Center Associates v. Watson,* 456 F.Supp. 1108 (N.D.Ill.1978); *Mutual Benefit Life Insurance Co. v. Atlas Financial Corp.,* 320 F.Supp. 93, 96 (E.D.Pa. 1970), *aff'd,* 454 F.2d 278 (3d Cir.1972). The dissipation of these assets threatened irreparable injury due to the defendants' shaky financial status, *Iowa Center Associates,* 456 F.Supp. at 1113; *Mutual Benefit Life Insurance Co.,* 320 F.Supp. at 96; or the necessity of multiple lawsuits to obtain relief against the relatively minor interests of the individual asset holders. *Lynch,* 666 F.2d at 1212. *See Iowa Center Associates,* 456 F.Supp. at 1113.

Of the cases cited by the plaintiff, only *Lynch* presents a situation where a solvent and trustworthy defendant was enjoined from distributing the assets of a common fund. There, the plaintiff brought an action against a bank, seeking to enjoin payments from the proceeds of a sale which were held in escrow. The court stated that the bank's solvent finances would not prevent irreparable harm because the terms of the escrow agreement might permit the bank to disburse the funds to numerous third parties without liability. 666 F.2d at 1211–12. Thus, in the absence of an injunction, plaintiff could "prove[ ] its right to the money," but nevertheless be unable to recoup these funds against the bank or the transferees. *Id.* at 1212.

The prevailing case law appears to leave the plaintiffs with an almost insurmountable task of demonstrating that they will suffer irreparable harm in the absence of an order enjoining the distribution of the Plan's assets. At a minimum, they must show that the substantial assets of the individual and corporate defendants would be insufficient or unavailable to satisfy a judgment. While the foregoing analysis suggests that in some instances a preliminary injunction might issue to preserve the integrity of a group of assets, this is not such a case.

The present owners of U.S. News have negotiated an agreement for a $10 million escrow account to cover the potential damages arising from this or related litigation. The plaintiffs have neither shown nor argued that if the monies in the escrow fund are exhausted by a damage award, U.S. News and American Appraisal are judgment proof, as was the case in *Iowa Center Associates*, 456 F.Supp. at 1113, or *Mutual Benefit Life Insurance Co.*, 320 F.Supp. at 96. Indeed, plaintiffs' counsel has indicated that pretrial discovery shows that American Appraisal "has insurance policies up to $50 million for at least some of the years of liability." Transcript of March 12, 1985 proceedings at 20. Of course, it is conceivable that some of plaintiffs' claims of undervaluation—such as their charge that the Board intentionally concealed relevant real estate information from American Appraisal—would not impose liability on American Appraisal. Nevertheless, a good portion of plaintiffs' claims, if they are successful, would implicate American Appraisal. Counsel did not discuss whether U.S. News was similarly insured.

Nor have the plaintiffs shown that the individual defendants are unable to respond to the damage claims. These defendants will receive $29 million from their combined interests in the Profit-Sharing Plan, bonus stock, and phantom stock. Px 49 at 23. These funds represent approximately 17 per cent of the total sales price. They also have at least $5 million in liability insurance coverage, either collectively or individually. Transcript at 20. There has been

no representation that the defendants intend to remove these assets from the jurisdiction of the Court, *cf. USACO Coal Co.*, 689 F.2d at 98; *Productos Carnic, S.A.*, 621 F.2d at 685–86; *Vesco*, 490 F.2d at 1340, 1354, or that the plaintiffs would be forced to pursue numerous individual actions in order to recover damages. *Cf. Lynch*, 666 F.2d at 1212; *Iowa Center Associates*, 456 F.Supp. at 1113. Thus, the plaintiffs have not established that they will be irreparably harmed in the absence of preliminary relief.

## B.

## LIKELIHOOD OF SUCCESS ON THE MERITS

The second major factor to be considered in the equitable calculus is the likelihood of success on the merits. One of the plaintiffs' primary claims is that the defendants breached their fiduciary duties under ERISA, 29 U.S.C. § 1001 *et seq.*, by undervaluing U.S. News' stock. Had the plaintiffs made the requisite showing of irreparable harm, the Court would have been inclined to grant them some relief on the basis of this claim.

ERISA, among other things, gives beneficiaries a cause of action against fiduciaries who breach their duties in administering employee benefit plans. *Russell v. Massachusetts Mutual Life Insurance Co.*, 722 F.2d 482, 488 (9th Cir.1983), *cert. granted*, —— U.S. ——, 105 S.Ct. 81, 83 L.Ed.2d 29 (1984). ERISA was enacted in order to:

> protect ... the interests of participants in employee benefit plans and their beneficiaries ... by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions and ready access to the Federal courts.

29 U.S.C. § 1001(b). Accordingly, the Act creates a comprehensive scheme of fiduciary duties for those entities with responsi-

bility for managing and administering plan funds. *Id.* §§ 1104(a), 1106.

■ The parties do not dispute that the profit-sharing and stock bonus plans are employee benefit plans within the meaning of ERISA. *See id.* § 1107(d)(3)(A)(i). In addition, some of the defendants, including U.S. News and the members of the Profit-Sharing Committee, were fiduciaries by virtue of the discretionary authority they exercised over the management and administration of the plans. *Id.* § 1002(21)(A)(i) and (iii). American Appraisal may also have been a fiduciary because it rendered appraisals which in turn were utilized by fiduciaries in administering the plans' assets.[4] *See Eaton v. D'Amato,* 581 F.Supp. 743, 746 (D.D.C.1980) (fiduciaries include persons with special expertise who act on discretionary judgments regarding an employee benefit plan). Given the status of the defendants and the manner in which the appraisals were conducted, the plaintiffs have presented a colorable claim that at least some of the defendants' activities may have run afoul of ERISA.

A strict set of standards governs the conduct of fiduciaries under ERISA. Their general duties are defined in section 404 of the Act, which requires each fiduciary to:

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> (A) for the exclusive purpose of:
>
>     (i) providing benefits to participants and their beneficiaries; and
>
>     \*   \*  ·  \*    \*    \*    \*
>
> (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;
>
>     \*   \*    \*    \*    \*    \*
>
> (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments

are consistent with the provisions of this title....

29 U.S.C. § 1104(a). In discharging these duties, a fiduciary must not engage in specified prohibited transactions. *Id.* § 1106.

■ These sections demonstrate that ERISA imposes both negative proscriptions and affirmative duties on its trustees. In short, they must make decisions "with an eye single to the interests of the [plan] participants and beneficiaries." *Donovan v. Bierwirth,* 680 F.2d 263, 271 (2d Cir. 1982) *aff'g as modified,* 538 F.Supp. 463, 469 (E.D.N.Y.1981), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982). The fulfillment of these duties may create conflicts where, as here, the fiduciaries are also officers of the sponsor corporation, U.S. News. Given this dilemma, individuals with potential dual loyalties—to the corporation and the employee benefit plan— have "an especial obligation to act fairly on behalf of those concerned...." *Donovan v. Bierwirth,* 538 F.Supp. at 469 (quoting *Withers v. Teachers' Retirement System of the City of New York,* 447 F.Supp. 1248, 1256 (S.D.N.Y.1978), *aff'd mem.,* 595 F.2d 1210 (2d Cir.1979)).

These standards have been applied to the activities of fiduciaries who utilize appraisals to determine the value of the assets of an employee benefit plan. For example, in *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984), the Secretary of Labor sued the fiduciaries of an ESOP on the theory that they had purchased certain shares of stock for more than adequate consideration. The fiduciaries had ascertained the purchase price on the basis of an appraisal which was conducted nearly two years before the transaction. *Id.* at 1468–69. In holding that the fiduciaries breached their duties by relying on an out-of-date appraisal, *id.* at 1473, the court found that fiduciaries are under a stringent duty to prudently investigate the reasonable fair market value of stock. Specifically, the Court noted that:

---

**4.** At present, the Court reserves judgment on the      proper characterization of American Appraisal.

[t]o use an independent appraisal properly, ERISA fiduciaries need not become experts in the valuation of closely-held stock—they are entitled to rely on the expertise of others.... However, as the source of the information upon which the experts' opinions are based, the fiduciaries are responsible for ensuring that that information is complete and up-to-date.

*Id.* at 1474.

The plaintiffs have raised serious legal questions concerning whether some of the parties to this action have complied with the strict standard of care imposed by ERISA. For instance, there is evidence in the record which suggests that U.S. News did not keep American Appraisal fully informed about information relevant to the stock appraisals. Although U.S. News did not formalize its real estate development plans until it signed the 1981 contract with Boston Properties, it had contemplated extensive changes in its land holdings since at least 1976. These contemplated changes played virtually no role in the appraisals prior to 1981.

This inattention to the possibility of significant real estate development is disturbing. Common sense suggests that the mere fortuity of an executed contract should not inure to the sole benefit of those individuals who happened to be employed by U.S. News when the contract was signed. But this appears to have happened. Those employees who retired from U.S. News in 1981 received payments from the Plan and U.S. News based on the 1980 appraisals of $152 per share. By 1981, these per share values had more than tripled to $470. Employees who retired in 1982 were the first employees to receive the benefit of this increase because none of the class members exercised their option to proportionately liquidate their interests in the Plan. They contend that they were never advised of the alternative to share in the fortunes of the Plan over a 10-year period.

Futhermore, serious questions have been raised about the appropriateness of utilizing a marketability discount in determining the value of the shares. U.S. News' employees could not sell their shares to a wide variety of purchasers, as is the case with shares of stock which are publicly traded. Nevertheless, these employees could always sell their shares back to the company when they retired or terminated their employment. In this sense, the employees of U.S. News enjoyed as favorable a market for their shares as the owners of publicly traded shares enjoy.

The application of a marketability discount decreased the value of the plaintiffs' interest in the Plan and in U.S. News. This undervaluation may very well violate ERISA standards. Of course, it remains to be seen which defendants could actually be held liable for such a breach.

C.

## BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST

■ Lastly, the Court must consider the balance of hardships between the parties and the public interest. Because the Court has found that the plaintiffs will not suffer irreparable harm in the absence of preliminary relief, these two factors need not be discussed in detail. Suffice it to say that the balance of hardships do not tip sharply in favor of the plaintiffs because other interested persons will suffer more than a "little harm" from an order restraining the distribution of the Plan's assets. *Holiday Tours*, 559 F.2d at 844. The overwhelming majority of these interested individuals are employees of U.S. News who are completely innocent of any wrongdoing. All of these individuals would forfeit the opportunity to spend the proceeds of the sale. At least some of them could lose certain favorable tax advantages. See Appendix B to Plan Memorandum. In light of these equities, the Court cannot conclude that the balance of hardship tips in favor of the plaintiffs.

## CONCLUSION

Based on the foregoing analysis, the Court determines that the plaintiffs have

not satisfied the standards for equitable relief. Accordingly, the Court denies the motion for a preliminary injunction prohibiting the distribution of funds by defendants U.S. News and the Profit-Sharing Plan. An appropriate Order is entered on this same date.