Charles S. FOLTZ, et al., Plaintiffs,

v.

U.S. NEWS & WORLD REPORT, INC.,
et al., Defendants.

Civ. A. No. 84–0447.

United States District Court,
District of Columbia.

June 14, 1985.

Alan Raywid, John D. Seiver, Susan P. Baxter, Cole, Raywid & Braverman, Washington, D.C., for plaintiffs Foltz, Handleman, Price, Williamson.

Richard J. Leighton, Avis Black, Washington, D.C., for Save the Fund.

Leslie A. Nicholson, Jr., Hannah E.M. Lieberman, Washington, D.C., for defendants U.S. News, Madana Realty.

Lawrence Latto, William Galeota, Julie Melamud, Shea & Gardner, Washington, D.C., for Profit-Sharing Plan.

Richard J. Wertheimer, Hadrian Katz, Edward Wolf, Washington, D.C., for defendants Sweet, Stone, Dunn, Keker.

Willis B. Snell, Willard K. Tom, Steuart H. Tomsen, Washington, D.C., for defendant The American Appraisal Co.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge.

### INTRODUCTION

On March 28, 1985, this Court denied the plaintiffs' motion for a preliminary injunction prohibiting the distribution of funds by defendants U.S. News and World Report, Inc. ("U.S. News") and the Profit-Sharing Plan of U.S. News ("Plan"), and issued a Memorandum Opinion in support of its decision, 608 F.Supp. 1332. The plaintiffs are former employees of U.S. News who challenge the undervaluation of their interests in the company and the Plan. The Court of

Appeals affirmed this Court's decision in part, vacated it in part and remanded the proceedings to this Court for further proceedings, "in light of the fuller explication of the legal issues on this appeal." *Foltz v. U.S. News & World Report, Inc.*, 760 F.2d 1300, 1301–02 (D.C.Cir.1985).

At this time, the Court determines that the plaintiffs are entitled to some equitable relief against the Plan under the provisions of section 1132(a)(1)(B) of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461. The reasons for this determination are set forth below. Before embarking on this discussion, the Court will address a few preliminary matters.

Following remand, the parties have expressed some disagreement about the meaning and breadth of this Court's initial opinion as it relates to the scope of the inquiry which the Court of Appeals directed this Court to undertake after remand. To dispel any remaining confusion or doubt, the Court will briefly summarize its initial findings and conclusions, and then turn to the questions raised by the Court of Appeals. Because the factual background of this litigation was discussed in great detail in both opinions, it will not be repeated here, except where it serves to clarify any additional findings and conclusions.

After remand, only the question of the propriety of injunctive relief against the Plan need be addressed. 760 F.2d at 1301, 1306–07. During the relevant period represented by the class plaintiffs, the Plan Committee, appointed by the U.S. News' Board of Directors, had responsibility for overseeing the daily activities of the Plan. The Committee continues to exercise this responsibility, and is the named fiduciary under the Plan. The Mercantile Safe Deposit & Trust Company is the trustee. The Court's March 28, 1985 opinion, of course, addressed the propriety of injunctive relief under ERISA against *both* U.S. News and the Plan. The findings and conclusions expressed in that opinion will be discussed in the context of the equitable relief which is available against the Plan. Such an inquiry, however, should also assess the damages which may ultimately be recovered from defendants other than the Plan.

## A.

### Memorandum Opinion of March 28, 1985

In its initial opinion, the Court canvassed the four factors which traditionally govern the issuance of a preliminary injunction: "the likelihood of success on the merits, the possibility that the plaintiffs will suffer irreparable injury in the absence of equitable relief, the balance of hardships between the parties, and the public interest." 608 F.Supp. at 1340. The plaintiffs' request for injunctive relief was disallowed because, in the Court's view, they had not "made the requisite showing of irreparable harm." *Id.* at 1343. In reaching that conclusion, the Court primarily relied on two factors: first, the well established rule that except in unusual circumstances, "monetary relief in a legal action may not be ordered prior to a final determination of liability and computation of damages," *id.* at 1341 (citing *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816 (D.C.Cir.1984)), and second, the plaintiffs' inability to demonstrate that "the substantial assets of the individual and corporate defendants would be insufficient or unavailable to satisfy a judgment." *Id.* at 1343.

Before reaching this conclusion, the Court examined the basis for the plaintiffs' claims that their interests in the company were liquidated at grossly undervalued rates. They supported their charges by arguing that five policies and practices of various defendants resulted in undervaluation: "failure to properly value U.S. News' significant real estate holdings, improper application of a marketability discount to reflect the fact that the stock was owned by a closely-held corporation, valuation of the stock on a minority basis rather than on a control premium basis, the inclusion of

certain items as liabilities,[1] and manipulation of the appraisals to match certain predetermined values fixed by U.S. News." *Id.* at 1337. These practices were criticized in an affidavit in which Mr. John Hempstead, the plaintiffs' expert, gave his opinion as to the proper fair market value of U.S. News' stock during the class period. His calculations were based on the crucial assumption that the sale price of the company in 1984, along with other financial indicia, should be utilized to determine the value of the company in previous years. These values, in turn, determined the fair market value of U.S. News' stock during that period. The plaintiffs utilized these figures to determine the amount by which their interests in the Plan were undervalued. This amount, plus prejudgment interest, equaled the plaintiffs' claimed damages. At the initial stage of the proceedings, the plaintiffs' claimed maximum damages of approximately $75 million from the Plan, including prejudgment interest.

Next, the Court discussed in some detail the basis for two of the allegedly improper appraisal practices identified by the plaintiffs: the claim that U.S. News' real estate holdings were undervalued and the claim that a marketability discount was improperly applied. The Court found that these practices supported the plaintiffs' claims that at least some of the *non-Plan defendants* breached the fiduciary duties imposed by ERISA. *Id.* at 1338, 1345. With respect to the question of the plaintiffs' likelihood of succeeding on their cause of action for breach of fiduciary duty against the *non-Plan defendants,* the Court stated that "[t]he plaintiffs have raised serious

legal questions concerning whether some of the parties to this action have complied with the strict standard of care imposed by ERISA [29 U.S.C. § 1109]." *Id.* at 1345. The propriety of the minority discount and the validity of including certain items as liabilities on the balance sheet was left unanswered. This latter practice allegedly affected U.S. News' applicable earning ratios, and resulted in the undervaluation of its stock.

Nor did the Court reach any conclusions about the amount of damages which might be attributed to the various components of the plaintiffs' undervaluation claims. These elements of the plaintiffs' damages rested in part on the appraisal policies and practices which have already been discussed: the minority and marketability discounts, real estate undervaluation, and the failure to make the appropriate adjustments to U.S. News' income.[2] A detailed analysis of the damage estimates was unnecessary because the Court found that the distribution of the Plan's assets would not irreparably injure the plaintiffs under any likely scenario. In the Court's view, the creditworthiness of the non-Plan defendants meant that a later judgment in favor of the plaintiffs would not go unsatisfied, even if that judgment equalled the plaintiffs' most generous damage estimates. In short, the Court viewed the assets of the Plan as a potential deep pocket source of damages whose dispersion did not threaten irreparable injury.

## B.
### Court of Appeals Opinion

The scope of this Court's inquiry on remand is clearly articulated in the thorough

---

1. The alleged errors with respect to certain liabilities of U.S. News are set forth at ¶¶ 27–29 of the Hempstead Affidavit, filed March 6, 1985. This practice is better described as a failure to make appropriate adjustments to U.S. News' income. *See* discussion *infra* at 637.

2. The plaintiffs' assertion that the appraisal values were manipulated is not relevant to their claim for benefits due from the Plan. *See* discussion *supra* at 636–37. Although this charge may support the plaintiffs' theory of liability against the other defendants, it does not contribute to their damage estimates. Even if the trier

of fact ultimately accepts plaintiffs' claim that the defendants manipulated the appraisals downward to reach certain predetermined values, the plaintiffs can only obtain benefits due from the Plan. Benefits are due only to the extent that the plaintiffs can show that their interests were worth more than the sums they received. The plaintiffs will support these claims by presenting evidence that the first four practices described above were improper. In contrast, the manipulation claim is relevant to means or motive.

opinion issued by the Court of Appeals. First and foremost, the Court of Appeals distinguished the cause of action asserted against the Plan under section 1132(a)(1)(B) from the cause of action for breach of fiduciary duty against the non-Plan defendants asserted under section 1109(a). Based on this analysis, the Court of Appeals directed this Court to

> examine whether the former employees would lose a potential legal claim against the Plan under [ERISA] were the Plan to pay out all or virtually all of its assets, and if so, whether the loss of a congressionally provided cause of action would work irreparable injury to the class.

760 F.2d at 1302. For purposes of this analysis, the Court of Appeals noted that the [district] court will be called upon to determine whether plaintiffs have demonstrated a substantial likelihood of success on the merits [on their claim for benefits due under a covered plan, 29 U.S.C. § 1132(a)(1)(B)]. If, moreover, the court finds on remand that irreparable injury would occur, then the more modest question is whether the plaintiffs have raised a serious legal question in this respect.

*Id.* at 1308 n. 7. Finally, the Court of Appeals stated:

> This is, emphatically, not to say that injunctive relief should in fact be afforded against the Plan. We make no such determination. To the contrary, we leave that question for the District Court to determine expeditiously on remand, in light of the full set of facts and circumstances as they now exist and continue to unfold.

*id.* at 1309, and then identified a variety of factors bearing on this consideration. This Court now turns to the inquiry directed by the Court of Appeals.

### LEGAL ANALYSIS

#### A.

#### Likelihood of Success on the Merits: the Claim for Unpaid Benefits Pursuant to 29 U.S.C. § 1132(a)(1)(B)

The plaintiffs have asserted a theory of liability against the Plan under ERISA which in many respects is separate and distinct from their ERISA asserted claims against the other defendants. The plaintiffs allege that the Plan has violated ERISA by withholding benefits owed to them by virtue of their status as participants in the Plan during the class period. This theory rests on section 502(a)(1)(B) of ERISA, which provides in pertinent part that:

> (a) A civil action may be brought—
>> (1) by a participant or beneficiary—
>>> (B) to recover benefits due to him under the terms of his plan....

29 U.S.C. § 1132(a)(1)(B). This cause of action provides a different defendant and a different theory of liability than does the concept of breach of fiduciary duty which may be redressed under section 1109(a).

The plaintiffs' theory of the Plan's alleged liability under section 1132(a)(1)(B), as now articulated, is straightforward. Relying on the language of the statute, the plaintiffs quite simply argue that Congress has provided participants in an ERISA plan a cause of action against their plan for any unpaid benefits which are due and owing. According to them, their interests in the Plan were appraised at grossly undervalued rates, and the Plan retained benefits which would have been paid on the basis of proper appraisals. They deftly sidestep the question of the elements of this cause of action and the precise standard which should be applied by the Court in determining whether benefits have been improperly withheld.

The plaintiffs' reluctance to precisely articulate the scope of their cause of action against the Plan is quite understandable, given the unusual nature of their claims. This Court has found no ERISA case quite like the present one, and agrees with the Court of Appeals that the claims raise "novel questions in the labyrinthine complexities of ERISA law and practice." 760 F.2d at 1308. As the Ninth Circuit aptly stated, "[n]o provision of ERISA mentions the circumstances under which a plan participant or beneficiary is entitled to recover

disputed benefits from a plan," *Menhorn v. Firestone Tire & Rubber Co.,* 738 F.2d 1496, 1499 (9th Cir.1984), and the legislative history on the question is sparse. Despite these difficulties, a few preliminary conclusions can be drawn about the scope of the congressionally created right of action provided by section 1132(a)(1)(B).

■ First, the legislative history of ERISA indicates that the avenues of relief and the right of action afforded pension plan participants should be generously construed. Congress gave "participants and beneficiaries [ ] broad remedies for redressing or preventing violations of the Act." H.R.Rep. No. 533, 93rd Cong., 2d Sess. 17, *reprinted in* 1974 U.S.Code Cong. & Ad. News 4639, 4655. These remedies include actions for "recovery of benefits due to participants." *Id.*

Second, the legislative history also reveals that Congress gave the federal courts considerable latitude to develop "a body of Federal substantive law ... to deal with issues involving rights and obligations under private welfare and pension plans." 120 Cong.Rec. S 29942 (Aug. 22, 1974) (Statement of Sen. Williams). As the Court has already indicated and the parties agree, this "body of substantive law" does not include any case involving a claim for benefits due which closely resembles this situation. Most of the cases under section 1132(a)(1)(B) involve judicial review of a plan's determination, through its administrators, that plan participants are not *eligible* for benefits. *See, e.g., Maggard v. O'Connell,* 671 F.2d 568, 570–71 (D.C.Cir. 1982). Here, in contrast, the question is not the plaintiffs' eligibility for benefits, but rather, the value of those benefits.

■ The judicial decisions reviewing eligibility determinations nevertheless provide a useful yardstick with which to mea-sure the propriety of all benefit determinations made by employee benefit plans. The case law suggests that a determination which results in the withholding of benefits allegedly due must, at the very least, satisfy the arbitrary and capricious standard of review. *See, e.g., id.* at 570–71. Although a stricter standard might conceivably apply in certain situations,[3] these decisions articulate a minimum standard which governs a Plan's benefit determinations under section 1132(a)(1)(B).

■ Third, as the defendants correctly assert, benefit determinations cannot be arbitrary and capricious as a matter of law if those decisions contain no element of discretion. For instance, a court may not invalidate as arbitrary and capricious a denial of benefits based solely on eligibility requirements which were established by a collective bargaining agreement. *United Mine Workers of America Health & Retirement Funds v. Robinson,* 455 U.S. 562, 573–74, 102 S.Ct. 1226, 1232–33, 71 L.Ed.2d 419 (1982). Moreover, an employer's strict compliance with the substantive terms of an employee benefit plan cannot be termed arbitrary and capricious, unless the provision itself violates federal law. *Moore v. Reynolds Metals Co. Retirement Program for Salaried Employees,* 740 F.2d 454, 456 (6th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 786, 83 L.Ed.2d 780 (1985). *See Hoffa v. Fitzsimmons,* 673 F.2d 1345, 1353 (D.C.Cir.1982) (nonERISA decision holding that finality clause in benefit plan precludes discretion to deny benefits). In sum, these cases stand for the general proposition that an administrator who strictly adheres to the lawful terms of an employee benefit plan may not be found to have acted arbitrarily and capriciously.

In light of these observations, the Court does not hesitate to conclude that the plaintiffs' claim for unpaid benefits against the

---

**3.** The plaintiffs cite *Donovan v. Cunningham,* 716 F.2d 1455, 1463–64 (5th Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) for the proposition that a higher standard—that of "prudence"—should apply to benefit determinations that affect the eligibility of more than a single claimant. *See, e.g.,* Plain-tiffs' Post-Remand Reply at 8 n. 5, filed May 17, 1985. *Donovan,* however, discussed a cause of action for breach of fiduciary duty, not a claim for benefits due. It cannot be assumed that the standards which govern recovery under these two distinct causes of action are identical.

Plan satisfies the first factor in the equitable calculus: likelihood of success on the merits. On the basis of the current record, and as the Court has already noted, the plaintiffs have made a colorable claim that the undervaluation of U.S. News' real estate holdings, coupled with the questionable practice of discounting the plaintiffs' interests in the Plan for their lack of marketability, resulted in appraisals which underestimated the value of the plaintiffs' interest in the Plan. 608 F.Supp. at 1339–1340, 1345. These appraisals were in turn relied on by the Plan's fiduciaries in paying the plaintiffs less than the true value of their interests in the Plan. If proven at trial, the liquidation of the plaintiffs' interests at undervalued rates constitutes a withholding of benefits due under the terms of a plan, and is arbitrary and capricious.

■ Nor are the Plan actions insulated from judicial review by virtue of the terms of the Plan document.[4] The Plan argues that the Plan document, which admittedly governed the disbursement of benefits to the plaintiffs, mandated the value assigned to the plaintiffs' interests in the Plan, and thereby precluded the Plan from exercising any discretion to reject the annual appraisals of U.S. News' stock transmitted to it by the Board of Directors. The Plan document directs the U.S. News' Board of Directors or other responsible officials to notify the Committee of the fair market value of U.S. News' stock, and the Committee in turn notifies the Plan Trustee of this figure. Article 6.3. For each year of the class period, the defendant American Appraisal Associates, Inc. ("American Appraisal") was retained by U.S. News to determine the value of its stock, in accord-

ance with Article Fifth (e) of the U.S. News Articles of Incorporation. Px 2 at 9.[5]

The value of plaintiffs' interests in the Plan were admittedly based on these appraisals.[6] As Article 6.3 of the Plan document provides:

> the market value of shares of stock of the Employer, which are held by the Trustee as a part of the Fund, *shall be* the fair market value established under Article Fifth, Paragraph (e), of the Certificate of Incorporation of U.S. News & World Report, Inc.

It further provides that the Committee and the Trustee "shall be fully justified and exonerated in relying" on these values. The Board of Directors, charged with reporting these values to the Plan, is not similarly exonerated.

Contrary to the Plan's assertion, the Court cannot conclude that the Plan was forced to rely on the appraisals transmitted by the Board of Directors. This provision might arguably protect the Plan from liability for minor discrepancies in valuing its shares of U.S. News' stock, or as the Plan puts it, in determining values "which, in hindsight, might appear to be a more accurate reflection of a metaphysical 'true' market value of the shares." Plan Post-Remand Memorandum at 28, filed May 10, 1985. Here, however, the plaintiffs have presented a colorable claim that their interests in the Plan were vastly undervalued and that this undervaluation was part of a common scheme, whose participants included members of the Committee, to enhance their ownership and profit-sharing interests in U.S. News at the expense of the plaintiffs. These are serious allegations which remain to be proved at trial. At this stage

---

**4.** The Plan Document, as amended and restated March 31, 1984, is attached as Ex. A to the Memorandum of the Plan, filed Feb. 20, 1985.

**5.** Px at —— refers to the exhibits filed by the plaintiffs on March 7, 1985, in support of their motion for a preliminary injunction. Although section e provided U.S. News and its employees with the option of reaching an agreement concerning the value of the stock without the necessity of an official appraisal, this option was

never exercised. Moreover, no appraisal was rendered in 1974.

**6.** The Plan's method of valuing its marketable securities has not been challenged. These marketable securities contributed to the value of the entire fund—defined as all of the Plan's assets—and were accordingly reflected in the value of each participant's interest in the fund. These liquid assets were also used to satisfy the fund balances of departing employees.

of the proceedings, however, the plaintiffs have made a threshold showing that the Plan's actions were arbitrary and capricious. The Plan document should not be interpreted to insulate this type of conduct from review under section 1132(a)(1)(B), or to permit the Plan to accept *any* appraisal submitted by the Board, no matter how inaccurate.

The interlocking membership and close relationship between the Board of Directors and the Plan managers buttresses the conclusion that the determination of benefits made by the Plan should be closely examined. The Plan Committee was appointed by the Board, and Board members frequently served on the Committee. Among the individual defendants, all of whom were former directors of U.S. News, only two individuals did not serve as Committee members during the relevant period. This tightly knit circle of control is illustrated by the fact that "a single individual within the Company's hierarchy could serve as director, officer, Plan committee member and trustee." 760 F.2d at 1302. The Plan document might insulate the Plan from liability if its administrators had no personal financial stake in the Plan, did not stand to gain from the alleged undervaluation, or were not the very same individuals who had approved the appraisals in their capacities as members of the Board. Here, however, these individuals and entities were not independent and unrelated, and they cannot argue that the responsibility for the benefit determinations lies elsewhere.

The Plan also argues that it is not liable under section 1132(a)(1)(B) because none of the other defendants occupied a fiduciary status with respect to benefit determinations.[7] There are several reasons why this argument must be summarily rejected.

■ First, the Court does not read section 1132(a)(1)(B) to necessarily require a showing that the non-Plan defendants occupied a fiduciary status, or that they breach-

ed any existing fiduciary duties. These are the elements of a cause of action for breach of fiduciary duty under section 1109(a), not for a cause of action for "benefits due" under section 1132(a)(1)(B). It is conceivable, although perhaps unlikely, that the plaintiffs could state a cause of action under the latter section without making out a case of individual liability under section 1109(a). In any event, the two causes of action are not identical.

■ Second, while the non-Plan defendants need not play fiduciary roles in order for liability to be asserted against the Plan under section 1132(a)(1)(B), it would appear that U.S. News and the individual defendants were in fact fiduciaries with respect to these benefit determinations. The precise status of American Appraisal has not yet been determined. *See* 608 F.Supp. at 1344 n. 4. Although an individual may be a fiduciary with respect to certain actions and a non-fiduciary with respect to other actions, *see United Independent Flight Officers, Inc. v. United Air Lines, Inc.,* 756 F.2d 1262, 1268 (7th Cir.1985), U.S. News and the individual defendants exercised sufficient discretion over the valuation of the Plan's assets so as to occupy the role of fiduciaries with respect to benefit determinations. *See* 608 F.Supp. at 1344.

■ It cannot be the case, as the Plan suggests, that no one occupied a fiduciary role in determining the value of the plaintiffs' interests in the Plan. If the Plan document in fact provides for such a result, it would violate ERISA. The terms of employee benefit plans which conflict with federal law are invalid. *See Short v. United Mine Workers of America 1930 Pension Trust,* 728 F.2d 528, 537 (D.C.Cir. 1984). If the Plan document violates ERISA, the plaintiffs could assert different grounds for relief. For the above reasons, the Court concludes that the plaintiffs have demonstrated that they are likely to prevail on their claim for benefits due under 29

---

7. Only the non-Plan defendants are eligible for fiduciary roles. The Plan, of course, cannot be a fiduciary of itself.

U.S.C. § 1132(a)(1)(B). This conclusion does not depend on a finding that the non-Plan defendants were fiduciaries with respect to benefit determinations, although such a finding may possibly grow out of this litigation.

## B.

### Irreparable Injury: The Status of the Plan and the Viability of the Plaintiffs' Cause of Action After Distribution of the Plan's Assets

■ At present, the Plan holds approximately $141 million dollars in assets. These funds were received from Mortimer Zuckerman, the new owner of U.S. News, in exchange for the Class A stock held by the Plan. The Plan has indicated its desire to free these assets for distribution to the current participants as soon as is practicable. The Court must thus address the likely status of the assets remaining in the Plan after the intended distribution, and whether these remaining assets would be sufficient to preserve the plaintiffs' cause of action against the Plan. The plaintiffs will not recover any benefits due from the Plan in the event that these assets are negligible. If this transpires, the central question is whether this loss of a cause of action for benefits due constitutes irreparable injury.

Although the parties have extensively briefed the question of the appropriateness of equitable relief following remand, they have provided very little information about the expected financial viability of the Plan after benefits are disbursed to the current participants. They cannot be faulted for this omission because the amount of assets which will remain in the Plan is completely speculative. Absent a court order restraining distribution of some or all of these funds, the Plan administrators are free to exercise their discretion to make these funds available to the current participants. These participants could elect to receive their account balances, or choose to leave a portion of their benefits in the Plan. Although the intentions of these individuals are not known, it is highly likely that most participants would elect distribution. Since it would appear that the plaintiffs would be hard-pressed to assert a claim to these benefits once they are received by innocent current employees, *see* 760 F.2d at 1307 n. 5, the employees will probably elect to receive their benefits, rather than leave them in the Plan where they might be recouped at a later date. Thus, the account balances of the current employees cannot be relied on to defray any damages which might be awarded at the conclusion of this litigation.

Once the Plan distributes the proceeds of the sale, the $10 million contingency fund which has been set aside to defray U.S. News' litigation expenses in this lawsuit is another potential source of funds available to pay a judgment. The terms of the merger agreement provide that most of this money will revert to the Plan after the conclusion of this litigation. The current participants, however, possess the right to any unexpended proceeds. Even if the current participants were precluded from exercising their rights to any remaining money, it is not inconceivable that the expenses of this litigation could consume a significant portion of the funds. Given these uncertainties, the availability of any Plan funds after this litigation has concluded is highly doubtful.

Moreover, the Plan has not voiced any intention to withhold some portion of the sale proceeds in the absence of a court order. In the absence of such a representation, it would appear that the Plan will be "drained of all or virtually all of its assets," 760 F.2d at 1309, regardless of its formal status. Although the Plan may remain in existence after the distributions have been made, the Court concludes that any assets remaining in the Plan will be minimal at best. Given the Court's preliminary conclusion that approximately $29 million in damages, plus prejudgment interest, may realistically be recovered from the Plan, these assets are plainly insufficient to satisfy the plaintiffs' cause of action for benefits due. Thus, "it is clear beyond cavil that any cause of action under ERISA ... would forever be lost." *Id.* at 1308.

In light of the conclusion that a cause of action under section 1132(a)(1)(B) will not survive in the absence of equitable intervention, the question is whether this loss constitutes irreparable injury. In its initial opinion, this Court concluded that the creditworthiness of the defendants against whom liability was asserted under section 1109(a) presented "the plaintiffs with an almost insurmountable task of demonstrating that they will suffer irreparable harm in the absence of an order enjoining the distribution of the Plan's assets." 608 F.Supp. at 1343. The Court then concluded that the plaintiffs had not made such a showing under the prevailing case law. *Id.*

Although the Court of Appeals conceded the viability of this precedent, it adopted an alternative approach to the question of irreparable harm, and directed this Court to analyze the question of irreparable injury from this alternative perspective. In the Court of Appeals' view, the creditworthiness of the non-Plan defendants should not be a relevant factor in this analysis. 760 F.2d at 1309.[8] Whatever the assets of the non-Plan defendants, the Court declared that the loss of a cause of action under section 1132(a)(1)(B) "could in our judgment, well work irreparable injury warranting" an injunction, *id.* at 1308, if the "weighing of the other factors in consideration of entitlement to equitable relief warranted, under settled principles, the fashioning of such relief." *Id.* n. 8.

This Court has already concluded that the plaintiffs have asserted a viable cause of action against the Plan under section 1132(a)(1)(B), that they are likely to succeed in their claim that their interests in the Plan were undervalued, and that the assets remaining in the Plan after the intended distribution will be insufficient to satisfy the claim against the Plan. These conclu-

sions mean that a contrary finding that the plaintiffs will not suffer irreparable harm in the absence of equitable relief is all but foreclosed. *See id.* at 1308–09.

To the extent that this issue has not already been resolved by the Court of Appeals, this Court now determines the loss of a cause of action under section 1132(a)(1)(B) would irreparably injure the plaintiffs. Congress intended that ERISA participants' entitlement to benefits should be preserved. 29 U.S.C. § 1001(a), (c); *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 731–32 (9th Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). In view of this remedial purpose, the loss of a cause of action for benefits due would work irreparable harm to the class plaintiffs.

### C.
### The Damages Which May Be Recovered From the Plan

**Introduction**

Finally, the Court must make a preliminary determination of the amount of damages which may "realistically be sought and recovered against the Plan itself," or put differently, "the likely extent of damages which might eventually be recovered were plaintiffs to prevail at trial." 760 F.2d at 1309–10. The plaintiffs suggest that the Court need not scrutinize the submissions of its experts because "damages need not be determined with a mathematical exactitude or certainty," Plaintiffs' Post-Remand Memorandum at 23, and argue that their estimates are "sufficient for purposes of framing appropriate equitable relief." *Id.* at 22. Although the Court cannot at this time precisely fix the damages which may be recovered against the Plan, it will not abandon its obligation to

---

8. The Court of Appeals did mention that the damages which might be recovered from other defendants should be considered in light of the damages which could be recovered from the Plan. *Id.* at 1309. This Court understands this statement to be a variant of the Court's earlier assertion that the causes of action against the Plan and the other defendants must be distin-

guished. *Id.* at 1307, 1308. This is the only way to reconcile this statement with the Court of Appeals' assertion that the loss of a cause of action under section 1132(a)(1)(B) constitutes irreparable injury, without regard to the damages available under a different section of ERISA.

carefully analyze the plaintiffs' claimed damages. Any other course would do violence to the Court of Appeals' express direction that any equitable remedy must be "carefully crafted in light of the entire set of circumstances before the trial court." 760 F.2d at 1309.

As compensatory damages, the class plaintiffs seek from the Plan unpaid benefits equal to the amount by which their interests were undervalued over the class period. The reasoning which supports their claim is simple. They seek "benefits due" from the Plan; benefits which were not paid because of undervaluation appear to be an appropriate source of compensatory damages within the meaning of section 1132(a)(1)(B). To arrive at a workable damage estimate, however, is not without difficulty. It requires a determination of the value of the U.S. News company during the class period, and a determination of the value attributable to a single share of its stock.

### The Parties' Damage Estimates

The parties' views on this matter differ widely, both with respect to the value of the company as a whole and the value of one share of its stock.

The plaintiffs' expert John Hempstead uses the 1984 sale price as the starting point for determining the value of the company during the class period. He then compares that price to certain financial indicia[9] to develop earnings ratios, and applies these ratios to the relevant financial indicia in previous years in order to estimate the value of the company in each of those years. He also factors in information relevant to the alleged value of U.S. News' real estate. He then assumes that the value of a single share of stock equals the value of the company as a whole, divided by the total number of outstanding shares of stock. In other words, the value of the parts, added together, equals the value of the whole.

Once Mr. Hempstead determines the value of a single share of U.S. News' stock, the estimate of the plaintiffs' damages is a fairly mechanical. In brief, this value is used to determine the "true" value of the assets held by the Plan in any given year, and the plaintiffs' percentage interest in this sum is then calculated. Finally, these sums added together, and excluding the benefits received by the class plaintiffs, represent the total undervaluation of the plaintiffs' interests in the Plan. The amount of this undervaluation represents their total claim for compensatory damages, excluding prejudgment interest. This estimate, revised following remand from the Court of Appeals, equals approximately $30 million[10] if damages for phantom stock are excluded.[11]

On the other hand, the Plan argues that the 1984 sale price is an inappropriate yardstick to utilize in estimating damages which might be recovered. Counsel for the Plan urge that such an approach is flawed in two major respects: first, the 1984 sale price, while it may represent the value of the company in 1984, is not a value which the defendants could have anticipated at the time the appraisals were rendered. Thus, the sale price is not relevant to the validity of these appraisals.

---

**9.** These indicia include advertising and total revenues, circulation, and other factors. Hempstead Aff. at ¶ 14.

**10.** The reference to the revised Hempstead estimate refers to the calculations contained in the updated damage summary which is attached to Plaintiffs' Post-Remand Memorandum. These calculations contain minor revisions to the initial damage estimate, which amounted to $31 million. *See* Damage Summary, filed March 6, 1985. The plaintiffs have since proffered a third estimate of recoverable damages based on certain revisions their experts have made to

their original calculations. This estimate equals $41 million which, adjusted to preclude phantom stock damages, amounts to approximately $37 million. *See* Damage Summary, attached to Plaintiffs' Post-Remand Reply.

**11.** If phantom stock were added, the estimate would increase by approximately $4 million. However, the Court will routinely exclude phantom stock damages from the plaintiffs' estimates because no claims for such damages may be asserted against the Plan. *See* discussion *infra* at 645.

Second, the 1984 sale price includes a control premium because a transfer of a majority interest in U.S. News took place. The current employees, as the beneficiaries of this transfer, received a value for their interests in the Plan which included this control premium. In contrast, the plaintiffs liquidated their interests in the Plan well before the sale, and these values were discounted to reflect the transfer of a minority interest. The Plan argues that this discount was entirely appropriate in view of the fact that no control premium accompanies a transfer of a less than fifty percent share of a going concern. Both criticisms rest on the assumption that a valid appraisal must be based on factors in existence at the time of the appraisal, rather than information which has later come to light.

The Plan then sets forth its estimate of damages attributable to the various appraisal practices which have been challenged by the plaintiffs. The Plan does not concede that these practices were in fact invalid; instead it addresses the more mechanical question of the effect of these practices, whether or not they were valid, on the valuation of the plaintiffs' interests in the Plan. The computation of the various damages which can be attributed to each of these practices shows that this theory supports maximum damages of $25 million.[12]

The plaintiffs reject the Plan's theory of damage recovery, and continue to assert their preference for the Hempstead approach. Nevertheless, they offer their own version of the damages which flow from the Plan's theory. This version does not differ remarkably from the Plan's estimates, and results in a total damage claim of $29 million.[13] Moreover, this sum is in all relevant respects nearly identical to the revised Hempstead estimate of approximately $30 million.

Under all of the above scenarios, the damage totals depend on the Court construing the underlying merits in a manner most favorable to the plaintiffs. The Plan argues that a more realistic damage assessment demonstrates that the plaintiffs' claim cannot possibly exceed $10 million. The Plan arrives at this estimate by attacking the validity of several of the plaintiffs' undervaluation premises on the merits, and reducing their damages accordingly. In other words, if any one of the challenged appraisal practices is upheld, this will reduce the total damages claimed because these damages rest on the theory that *all* of the practices will be found invalid.

**Phantom Stock**

As a preliminary matter, the Court must address the question of whether phantom stock damages may be recovered against the Plan. The claim for such damages arises from the alleged negative effect of the phantom stock obligations on the earnings ratios calculated by Mr. Hempstead, and the related effect on the value of U.S. News' stock. The value of phantom stock claims is approximately $4 million. The plaintiffs theorize that if the funds used to satisfy phantom stock obligations were instead shared on a pro rata basis by the current employees, the applicable earnings ratios would increase, and thus augment the value of the stock held by the Plan.

This reasoning means that the Plan received less for its shares of stock than it would have received in the absence of phantom stock payments. Thus, all of the potential claimants to the Plan assets are damaged by the phantom stock payments, except for the individual defendants who

---

**12.** This sum is derived from the Plan's estimates of the maximum degree of undervaluation which can be attributed to the four challenged practices: real estate manipulation ($10.1 million) (Plan Post-Remand Memorandum at 42), marketability discount ($.5 million) (*id.* at 45); balance sheet errors ($2.4 million) (*id.* Table II), and control premium ($12 million) (*id.* at 63). The third item is premised on the plaintiffs'

claim that U.S. News' contribution to the Plan was treated incorrectly on the balance sheet.

**13.** The plaintiffs' estimates exceed the Plan's estimate by $4 million because they attribute an additional $2.6 million to real estate damages and an additional $1.4 million to the alleged balance sheet error regarding the profit-sharing contribution.

are the recipients of these funds. In this respect, the plaintiffs' claim for phantom stock damages differs markedly from their other claims, which are premised on allegations that the Plan and its current beneficiaries received a windfall by retaining funds which were owed the plaintiffs.

■ Whatever the merits of the claim for phantom stock damages against U.S. News and the individual defendants, such claims do not lie against the Plan. This is so because the Plan does not hold any assets representing the value of the phantom stock obligations. The funds representing the phantom stock are held by U.S. News and are payable to the several individual defendants who are charged with wrongfully enriching themselves at the expense of the plaintiffs and the current employees. If and when the phantom stock arrangements are found to be invalid, the funds held by U.S. News should be the source of damages.

Moreover, to permit the plaintiffs to assert a claim for phanton stock damages against the Plan would mean that the current employees would not receive the benefits which are due them. As an equitable matter, the current employees should not be deprived of their entitlement to benefits. If a cause of action for phantom stock damages lies against the Plan under any circumstances, the Plan at most serves as a secondary pool of assets to satisfy any losses from unpaid benefits suffered by the plaintiffs. If there is liability, U.S. News and the individual defendants are primarily liable, and U.S. News holds the relevant fund. As the Circuit Court opinion states, the extended payment period for the notes "guarantees that the vast majority of this fund will remain available to satisfy any future judgment." 760 F.2d at 1306. Under the circumstances, injunctive relief against the Plan based on the alleged losses caused by the issuance of phantom stock should be denied.

### Balancing the Equities

After a careful review of the record in this proceeding, the Court concludes that three options are available as a basis for determining any damages which may realistically be recovered from the Plan, and the corresponding amount which should be withheld and subject to a preliminary injunction. First, the Court could approve the approach which utilizes the 1984 sale price as the appropriate measure, and restrain the distribution of $37 million, based on Mr. Hempstead's latest estimate. *See supra* at 644, n. 11. Second, the Court could assume for purposes of this motion that all of the allegedly improper appraisal practices identified by the plaintiffs were in fact erroneous. The Court would then have to choose between the plaintiffs' estimate ($29 million) and the Plan's estimate ($25 million). *See supra* at 645. Finally, the Court could adopt the Plan's suggestion and assume that only the challenges to the marketability and real estate practices are remotely meritorious, apply the reductions suggested by the Plan, and enjoin the distribution of something less than $10 million.

This is not a simple task. Without benefit of the trial testimony which will likely invoke considerable theorizing and explanations by experts, the Court cannot make any precise determinations about the amount of damages which may be awarded against the Plan. The task is complicated by the fact that the expert analysis is ongoing. Indeed, the deadline for the Plan's identification of experts has not yet elapsed. The Plan, in challenging the merits of the practices which the plaintiffs have identified as invalid, has relied in large part on the contentions of Michael Megna, a vice-president of American Appraisal, as well as other relevant authority. Most importantly, the plaintiffs' claim for benefits due must be balanced against the rightful claims of the current employees. Any damages awarded must ultimately respect these competing equities.

Despite these difficulties, the Court has the responsibility to make a realistic, albeit possibly imperfect, estimate of the damages which may be recovered against the Plan. Equitable considerations require that it balance the interests of the plain-

tiffs against the interests of the 505 current employees of U.S. News, who will undoubtedly suffer the impact of an order restraining a distribution of funds.

This has been undertaken and the Court concludes that the second option best resolves the competing interests. Thus, equitable relief should be based on the assumption that the plaintiffs are likely to prove that the *specific* appraisal practices which have been challenged were improper. Moreover, the Court in the exercise of discretion and caution will adopt the plaintiffs' estimate of $29 million, rather than the Plan's estimate which is $4 million less.

This approach is considered most prudent for the following reasons. First, the plaintiffs' challenges to these appraisal practices satisfy the threshold elements for injunctive relief. Since irreparable injury would occur if inadequate funds remain in the Plan, the plaintiffs need only raise serious legal questions with respect to these practices. At this time, the Court reaffirms its conclusion that they have, at the very least, raised serious legal questions concerning the validity of the real estate and marketability discount practices. *See* 608 F.Supp. at 1345. Moreover, the challenge to the minority discount raises serious questions, although this practice, on its face, is perhaps more justifiable than the other two. Hypothetically, a control premium would increase the value of a single share of stock within the control block, and, absent a control block, a minority discount might be appropriate. Here, however, the Plan document lends some support to the argument that the Plan's shares, and the value of a single share within that block, should be more appropriately valued on the basis of a control premium. Although the Court is not prepared to draw any definitive conclusions at this point in the proceedings, serious questions have been raised with respect both to this practice, and the practice of including the profit-sharing contribution as a liability of

the corporation. *See* Hempstead Aff. at ¶ 28.

Second, and perhaps more important, this approach best permits the Court to balance the respective interests of both the plaintiffs and the current employees, the two groups affected by a decision to restrain distribution of a portion of the Plan's assets. The other two options are questionable; they tip the scales too far in the direction of their respective advocates. The Plan's estimate of $10 million raises the specter that the plaintiffs' damages will be severely underestimated. This underestimate would be tantamount to the loss of a congressionally provided cause of action, and, as such, would constitute irreparable harm. *See* discussion *supra* at 642–643. The middle ground approach protects against the possibility that the damages which may ultimately be asserted against the Plan will not be available at the conclusion of this litigation.

On the other hand, adoption of the Hempstead measure—$37 million—presents the possibility that damages would more than likely be overestimated. An order restraining the distribution of any Plan assets will harm the current beneficiaries, who are also protected individuals under ERISA. In this sense, an order which in hindsight is found to have restrained excessive funds is only slightly less undesirable than an order restraining insufficient funds.

Moreover, there are other creditworthy defendants present in this litigation should the plaintiffs face the risk that inadequate assets have been held back and retained by the Plan. If the plaintiffs' losses are slightly in excess of $29 million, at least some of the remaining defendants will likely be exposed to liability for those amounts, although the theories supporting recovery may differ. The Court has already found that all of these defendants are creditworthy. 608 F.Supp. at 1343.[14]

14. The creditworthiness of the other defendants does not, however, make an order restraining the distribution of funds unnecessary. *See* dis-
cussion *supra* at 644, n. 9. Instead, the Court views the assets of the other defendants as a

Thus, the Court concludes, on the basis of the above findings, that the plaintiffs might realistically recover damages against the Plan in this litigation in the amount of $29 million, apart from the question of prejudgment interest. The Court cannot assume that the current employees will voluntarily leave their benefits in the Plan or that the $10 million contingency fund will be available to satisfy a judgment. *See supra* at 1309–10. Thus, the Plan shall withhold this entire sum from distribution.[15] The Court will now turn to the question of "whether prejudgment interest claims can appropriately and lawfully lie against the Plan under any circumstances." 760 F.2d at 1310.

### Prejudgment Interest

In *Massachusetts Law Reform Institute, Inc. v. Legal Services Corp.*, 601 F.Supp. 415 (D.D.C.1984), the Court awarded prejudgment interest after canvassing the relevant case law. That decision is instructive here. A decision to award such interest is within the Court's discretion in the absence of statutory guidance. Prejudgment interest is awarded in order

> to compensate the prevailing party for the financial loss represented by his inability to use the money due him between the date his claim accrued and the date of judgment.

*Id.* at 424 (citations omitted). *See also Donovan v. Carlough*, 581 F.Supp. 271, 272 (D.D.C.1984) (ERISA). Put differently, such an award can be seen as a means to transfer to the prevailing party the gain the losing party realized, or could have realized, from the use of the money during the relevant time period. *See, e.g., Short v. Central States, Southeast & Southwest Areas Pension Fund*, 729 F.2d 567, 576 (8th Cir.1984); *Donovan v. Carlough*, 581 F.Supp. at 272. Because the law does not protect a losing party who is either a

spendthrift or otherwise improvident, the amount of interest is calculated on the basis of a statutory rate, or under unusual circumstances, the prevailing market rate. The availability, as well as the amount, of this relief should be determined in accord with equitable principles. *Lodges 743 and 1746, International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. United Aircraft*, 534 F.2d 422, 447 (2d Cir.1975), *cert. denied*, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976).

Prejudgment interest may be awarded against employee benefit plans for the withholding of benefits due under ERISA. *See, e.g., Short v. Central States*, 729 F.2d at 576; *Donovan v. Carlough*, 571 F.Supp. at 272. Those holdings are premised on the fact that the plans in question received a windfall from the use of the money, while the employees suffered a concomitant loss. The *Donovan* court did not attempt to estimate the value of this windfall, but instead ordered the payment of simple interest at the rate of 6% per annum pursuant to D.C.Code § 28–3302.

In this case, like *Donovan*, it is reasonable to conclude that the Plan received a windfall from retaining the benefits allegedly owed to the plaintiffs. The amount of this gain, however, cannot be estimated with any precision. The parties themselves have advanced no fewer than four separate theories, with attendant variations, to support their claims as to how it should be measured. They need not be examined in detail; suffice it to say that they rely on an array of data which includes corporate bond yields, 90-day Treasury bill rates, prime rates, appreciation rates, and the appropriate measure of the earnings of the Plan during the relevant period. This nearly indecipherable morass convinces the Court that the prudent and fair course is to

bulwark which guards against additional potential losses.

**15.** The Court rejects intervenor Save the Fund's suggestion that distribution of the account balances of the individual defendants should be enjoined first before any injunctive relief is ordered against the account balances of the re-

maining current employees. The premise of the injunctive relief ordered is that *all* of the current employees may have received a windfall, and for this reason, the account balances of the individual defendants need not be treated differently.

follow *Donovan*, and award simple interest at the 6% rate.

The interest award in *Donovan* is particularly pertinent because it adopts the general rule that trustees, and presumably employee benefit plans, should be charged with simple interest at the applicable legal rate. The only exceptions to the general rule involve claims asserted against errant fiduciaries. *See, e.g., Katsaros v. Cody*, 744 F.2d 270, 281 (2d Cir.), *cert. denied,* — U.S. ——, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984). But here, the Plan is not so characterized; nor should it be forced to disgorge its assets at the expense of innocent participants.

The decision to withhold from distribution an amount equal to prejudgment interest at the statutory rate rests on a careful assessment of the equities in an attempt to reach a result which is fair to both the plaintiffs and current participants. The Plan shall make the relevant computations, using as its base figure the $29 million sum, and shall assume that the benefits due for each class year may be derived from the tables attached to the Plaintiffs' Post-Remand Memorandum. Tables IIIB and IVB. The minor discrepancies between the sum total of these figures and the $29 million figure are insignificant, given the vast sums involved in this litigation. These calculations should be extended through December 31, 1985, and an amount equal to this sum shall be retained by the Plan.[16]

## CONCLUSION

In sum, and on the basis of the above discussion, the Court concludes that the class plaintiffs are entitled to a preliminary injunction prohibiting the distribution of Plan assets in an amount equal to the unpaid benefits which they may realistically expect to recover from the Plan, namely $29 million, in addition to prejudgment interest at a 6% rate. This is the Court's realistic assessment of the plaintiffs' claim for unpaid benefits in the event the Plan is found liable.

---

16. Should the distribution take place after December 31, 1985, the Plan will be required to update its estimates and withhold additional funds. Once the distribution is effected, any withheld assets will earn interest, which means that additional prejudgment interest need not be calculated after distribution.