**LYNCH CORPORATION, an Indiana Corporation, Appellee,**

v.

**OMAHA NATIONAL BANK, a National Banking Corporation, Appellant.**

**No. 81–1271.**

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 15, 1981.

Decided Dec. 16, 1981.

Gerald L. Friedrichsen, argued, Fitzgerald, Brown, Leahy, Strom, Schorr & Barmettler, Omaha, Neb., for appellant.

Maureen E. McGrath, argued, Kutak, Rock & Huie, Omaha, Neb., for appellee; Gregory L. Curtner, Miller, Canfield, Paddock & Stone, Detroit, Mich., of counsel.

Before HEANEY and STEPHENSON, Circuit Judges, and DAVIES,* Senior District Judge.

STEPHENSON, Circuit Judge.

Defendant-appellant Omaha National Bank (ONB) appeals the district court's[1] order granting Lynch Corporation's (Lynch) request for a preliminary injunction. The court enjoined ONB from making any distributions of money from the Escrow Fund established at ONB as required by the purchase agreement between Lynch, the buyer, and M-Tron Industries, Inc. (M-Tron), the seller. The order provided that the injunction continues and the instant case is stayed until a final determination is reached in a pending South Dakota case involving a dispute over Lynch's purchase of the assets of M-Tron. ONB challenges the appropriateness of the injunction by arguing: (1) that Lynch has no threat of irreparable harm; (2) that the balance of equities is in ONB's favor; and (3) that Lynch has not proven a probability of success on the merits because the escrow agreement authorized the payments the bank was making from the Escrow Fund or because even if the escrow agreement did not authorize the payments, there is enough money in the fund to meet the requirements of the escrow agreement. We affirm the district court.

I. BACKGROUND

On March 12, 1976, Lynch, an Indiana corporation, executed a purchase agreement with M-Tron, a South Dakota corporation, and agreed to purchase all of M-Tron's assets for $5,305,884. The purchase agreement provided that Lynch's check for $4,863,727 would be delivered to M-Tron and that the balance of $442,157 would be deposited with ONB and held in escrow pursuant to the terms of the indemnification and escrow agreement (escrow agreement) signed by Lynch, M-Tron and ONB. Because Lynch knew that the purchase money would be quickly distributed to M-Tron's shareholders by its liquidating trustees, Lynch had demanded the establishment of the Escrow Fund as security for the sale-connected warranties and indemnifications M-Tron gave Lynch.

The shareholders of M-Tron approved the sale and on April 15, 1976, the sale was closed. After the closing M-Tron changed its corporate name to MII Liquidating Company (MII) and was eventually dissolved by South Dakota in April of 1977. After the purchase money was transferred to ONB,

---

* The Honorable Ronald N. Davies, Senior United States District Judge for the District of North Dakota, sitting by designation.

1. The Honorable Albert G. Schatz, United States District Judge for the District of Nebraska.

$4,863,727 was deposited into the Shareholders' Fund account governed by the shareholders' depositary agreement and $442,157 was deposited into the Escrow Fund account governed by the escrow agreement. Within seven days of the initial deposit into the Shareholders' Fund, all except $4000 to $5000 of the $4.5 million had been distributed to approximately three hundred MII shareholders.

The escrow agreement, drafted by M-Tron, stated that the Escrow Fund "shall terminate 185 days from and after the date of Closing of the Purchase Agreement." At that time ONB, as escrow agent, was directed to transfer the balance remaining in the Escrow Fund to the Shareholders' Fund. However, if Lynch made a claim of an indeterminate amount against the Escrow Fund before the 185 days expired, then ONB was directed to make no distribution of the Escrow Fund until Lynch's claim was finally determined by agreement of Lynch and MII, by arbitration or by a court judgment.

On October 15, 1976, before the 185-day termination date, ONB received notice from Lynch that it was making a claim against the Escrow Fund for an indeterminate amount. Negotiations concerning the claim were unsuccessful so on May 2, 1977, MII filed a declaratory judgment action in federal court in Nebraska. In ONB's answer it stated that it had not transferred money from the Escrow Fund to the Shareholders' Fund because it was aware of the conflicting claims of Lynch and MII to the money in the Escrow Fund. On April 7, 1978, the district court dismissed the action because it determined that the suit involved the proper interpretation of the purchase agreement and that the court had no personal jurisdiction over Lynch for disputes concerning that agreement. The dismissal was not appealed.

On April 20, 1978, Lynch instituted an action against MII, its directors, officers and shareholders in federal court in South Dakota where jurisdiction existed regarding all defendants. However, ONB could not be joined in the action due to the protection of the National Bank Venue Statute, 12 U.S.C. § 94. Lynch's complaint alleges breach of contract, fraud, deceit and misrepresentation and requests rescission of the purchase agreement and restoration of all money received by MII pursuant to the purchase agreement.

On April 21, 1978, Lynch's attorney, Mr. McLaughlin, telephoned Mr. Wheeler, ONB's trust officer, and informed him that the complaint had been filed and explained the general nature of the complaint. On April 25, 1978, Mr. McLaughlin sent Mr. Wheeler a letter that contained a copy of the complaint.

On May 10, 1978, ONB received a letter from MII's Nebraska attorneys. The attorneys enclosed a statement for their services on MII's behalf and advised the bank that paragraph X of the shareholders' depositary agreement authorized ONB to pay such legal fees out of the *Shareholders' Fund* without the consent of Lynch. On May 19, 1978, ONB received a letter from Mr. Martin, one of the liquidating trustees for MII. Mr. Martin informed the bank that the Nebraska attorneys representing MII and the other two trustees gave their approval to his letter authorizing ONB to release funds out of the *Escrow Fund* to pay the legal fees of the Nebraska attorneys and the accounting fees of Peat, Marwick, Mitchell & Co. incurred by MII. Without notifying Lynch, ONB began making disbursements from the Escrow Fund.

In November of 1979, ONB requested and received blanket permission from MII to make payments from the Escrow Fund for bills received without first contacting the shareholders' representatives for authorization. From May 1978, until November 1980, over $150,000 was paid from the Escrow Fund for attorneys' fees incurred by MII in defending Lynch's South Dakota action. From May of 1980, until November of 1980, Lynch made many attempts to obtain information from ONB and MII concerning the status of the Escrow Fund. Both ONB and MII refused to cooperate and would not reveal the status of the

account.[2] Finally, Lynch served a subpoena on the bank in October of 1980, and learned for the first time that over $150,000 had been withdrawn from the account. Over $60,000 of the attorneys' fee withdrawals were made after May of 1980, when Lynch requested ONB to disclose the status of the account and it refused. ONB now admits that it made a mistake in not disclosing the information to Lynch.

On December 5, 1980, Lynch filed a complaint against ONB in federal court in Nebraska alleging that ONB intentionally and wrongfully made payments from the Escrow Fund in violation of its fiduciary and contractual obligations. Lynch's amended complaint, filed January 26, 1981, added an allegation that if Lynch is successful in the pending South Dakota litigation, then both the purchase agreement and the escrow agreement will be rescinded. Lynch requested a temporary injunction preventing ONB from making any distributions from the Escrow Fund which the court granted on January 30, 1981. Lynch's request for a preliminary injunction was granted on February 6, 1981. The court enjoined ONB from making any disbursements of any kind from the Escrow Fund until a final determination was reached in the South Dakota litigation.

## II. ANALYSIS

We have a limited scope of review and accord the district court considerable discretion in its determination of whether or not preliminary injunctive relief is appropriate. *Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861, 866 (8th

Cir. 1977). Although the district court applies a stringent standard in deciding the appropriateness of injunctive relief, "the standard of appellate review is simply whether the issuance of the injunction, in light of the applicable standard, constituted an abuse of discretion." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931–32, 95 S.Ct. 2561, 2567–68, 45 L.Ed.2d 648 (1975). We conclude the district court did not abuse its discretion in issuing the preliminary injunction. It applied the appropriate standard in granting preliminary injunctive relief:

> [W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.

*See Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).

### A. Irreparable Injury

ONB argues that even if the disbursements it made were wrongful, Lynch has not proven irreparable harm because ONB is a solvent defendant capable of responding in damages. Further, ONB argues that the fact that the money may be distributed to numerous third-parties requiring a multiplicity of lawsuits to recover the money does not support injunctive relief.

Before ONB's solvency prevents irreparable harm it would have to be held liable to Lynch for the disbursements from the Es-

---

**2.** On May 21, 1980, Lynch's attorney, Mr. McLaughlin, called Mr. Wheeler of ONB to determine the status of the Escrow Fund. Mr. Wheeler was not in and his secretary told Mr. McLaughlin she could not give out that information.

On May 23, 1980, Mr. Wheeler wrote to MII's Nebraska attorneys and informed them that Mr. McLaughlin had called to determine the balance in the Escrow Fund but he was not given that information by Mr. Wheeler's secretary.

On May 27, 1980, Mr. McLaughlin again called Mr. Wheeler and attempted to discover the status of the Escrow Fund. Mr. Wheeler stated that he could not disclose the status without the consent of MII's attorneys and the Shareholders' Representative. Lynch then attempted to obtain the information from MII's attorneys but it was unsuccessful.

On June 4, 1980, ONB received a letter from Mr. Burke, the South Dakota attorney for MII's shareholders. Mr. Burke requested immediate payment of his fees and stated: "Mr. McLaughlin has been making inquiries and I would not like to have any outstanding bills held up while he makes his move in Federal Court, if he intends to make one." ONB paid Mr. Burke's fees.

Lynch's later attempts to discover the status of the fund were also unsuccessful, so it served a subpoena on the bank.

crow Fund. The bank's duties are defined by the escrow agreement. *Katleman v. U. S. Communities, Inc.,* 197 Neb. 443, 249 N.W.2d 898, 901 (1977). Assuming that ONB's distributions were authorized by the escrow agreement, ONB would not be held liable for any breaches by MII that caused the rescission of both the purchase and the escrow agreement in the pending South Dakota litigation. *See Perkins v. Clinton State Bank,* 593 F.2d 327, 336 (8th Cir. 1979). Therefore, if Lynch gains rescission in the South Dakota suit but is denied injunctive relief here, Lynch would have proven its right to the money, but in the meantime, ONB would have disbursed the money without liability to numerous third parties. Lynch argues that the purpose of the escrow agreement was to provide Lynch with security for its potential claims against the liquidated MII and to prevent this type of situation.

Should Lynch succeed in the South Dakota litigation, it would be forced to pursue the numerous transferees who received escrow money from ONB. Lynch's injury is irreparable and there is no adequate remedy at law because a multiplicity of suits would be required to gain relief. *See Galella v. Onassis,* 353 F.Supp. 196, 235 (S.D.N.Y. 1972), *modified on other grounds,* 487 F.2d 986 (2d Cir. 1973). Here, as in the case of *Mansfield Hardwood Lumber Co. v. Johnson,* 242 F.2d 45, 48 (5th Cir. 1957), irreparable harm is established when the distribution of assets of a liquidated company before an adjudication of rescission claims would defeat and delay satisfaction of those claims if they were ultimately sustained.[3]

### B. *Balancing the Equities*

ONB argues that an injunction prohibiting distributions subjects it to possible liability to MII for failure to disburse funds in violation of the escrow agreement. However, there is no evidence that MII has made any claims against the Escrow Fund since this litigation commenced. Further,

ONB can avoid any potential liability by depositing the money with the court and interpleading MII as it offered to do in the previous Nebraska litigation.

Mr. Wheeler, the trust officer in charge of the Escrow Fund, testified that he could not envision any harm to ONB from an injunction prohibiting disbursements pending the resolution of the South Dakota litigation. The district court correctly determined that the balance between Lynch's threat of irreparable harm and any injury to ONB "tips decidedly and clearly" in Lynch's favor.

### C. *Probability of Success on the Merits*

ONB argues that Lynch has no probability of success on the merits because paragraph XII of the escrow agreement authorized the bank to pay fees and expenses necessary to the dissolution and winding up of MII. ONB claims that the attorney fees of MII in defending the South Dakota litigation belong in that category of expenses.

The essence of the probability test is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase Systems, Inc. v. C L Systems, Inc., supra,* 640 F.2d at 113. Also, "where the balance of other factors tips decidedly toward [Lynch] a preliminary injunction may issue if [Lynch] has raised questions so serious and difficult as to call for more deliberate investigation." *Id.*

Lynch's position is that ONB has not complied with the strict execution of its duties required by Nebraska law. *See Katleman v. U. S. Communities, Inc., supra,* 249 N.W.2d at 901. Lynch argues that the escrow agreement provided that claims against the money had to be made during the 185-day life of the fund. Therefore, ONB had no authority to honor any claims from either Lynch or MII after the 185-day period and it is not disputed that MII made

---

**3.** Since Lynch has established irreparable harm, we do not reach the issue of whether the court could have enjoined ONB without a showing of irreparable harm because of ONB's fiduciary status.

no claims against the fund during that time period. Lynch, of course, did make a claim within the 185 days and Lynch argues that this did not extend the time for making claims. Rather, the escrow agreement provides that after the 185th day, ONB is to hold the money as security for Lynch's claims. Lynch rejects as illogical ONB's interpretation that the legal expenses incurred by MII in defending against Lynch's claims are properly payable from the same fund which was created to serve as security for those very claims.

Lynch has raised serious questions requiring a more deliberate investigation into the appropriate interpretation of the escrow agreement and the balance of equities favors injunctive relief to preserve the status quo. *See Dataphase Systems, Inc. v. C L Systems, Inc., supra,* 640 F.2d at 113.

ONB's final contention is that even if Lynch proves the escrow agreement did not authorize ONB's disbursements, Lynch has no probability of success on the merits because Lynch's security is limited to the original $442,157 deposit and does not include the interest which belongs to MII. ONB argues that the disbursements from ONB on behalf of MII did not exceed the interest earned on the money.

Lynch responds that the escrow agreement authorized ONB to invest the money *only* during the 185-day period of the Escrow Fund. After that, the escrow agreement required ONB to hold the money for Lynch's benefit if Lynch made a claim. Paragraph II of the escrow agreement expressly provides that the money is security for the "total amount of any liability" and Lynch argues that the original deposit is, therefore, not a limit on the amount recoverable by Lynch.

Lynch also contends that the only way that the disbursements can be found to be less than the interest earned is by adding in the interest earned *after* the last disbursement. Further, Mr. Wheeler, the ONB trust officer, testified that the disbursements were made without regard to whether they came from interest or principal.

The above claims of Lynch raise serious questions and justice, therefore, requires preservation of the status quo until a determination on the merits is reached. The district court did not abuse its discretion in granting the injunction.

Affirmed.