BASIN ELECTRIC POWER
COOPERATIVE,
Plaintiff,

v.

MPS GENERATION, INC., Mechanical Plant Services of North Carolina, Inc., Light Logix, Inc., Lacy M. Henry, Judy Henry, and Keith D. Henry, Defendants.

No. A1–05–29.

United States District Court,
D. North Dakota,
Southwestern Division.

March 21, 2005.

Mark D. Foss, John C. Kapsner, Michael T. Andrews, Vogel Law Firm, Bismarck, ND, for Plaintiff.

B. Timothy Durick, Pearce & Durick, Bismarck, ND, for Defendants.

## ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

HOVLAND, Chief Judge.

Before the Court is the plaintiff, Basin Electric Power Cooperative's ("Basin Electric") Motion for a Preliminary Injunction filed on February 14, 2005. Basin Electric also sought a temporary restraining order enjoining the Defendants from obtaining funds currently held in an escrow account pursuant to certain contracts described below, until a final determination of the merits is made in the above-entitled action. On February 25, 2005, the Court granted the Plaintiff's request for a temporary restraining order preventing the funds held in an escrow account at Wells Fargo Bank in Bismarck, North Dakota, from being disbursed until further Order of this Court.

A hearing on the motion for a preliminary injunction was held on Wednesday, March 16, 2005. Attorney John C. Kapsner appeared and represented the plaintiff, Basin Electric. Ron Rebenitsch testified on behalf of Basin Electric. Attorney Timothy Durick appeared and represented the Defendants. Lacy M. Henry testified on behalf of the Defendants.

## I. BACKGROUND

The circumstances giving rise to this action have not changed since the Court issued its temporary restraining order. This action arises out of a contract dispute between Basin Electric and the Defendants. Basin Electric is a North Dakota cooperative principally located in Bis-

marck, North Dakota, which provides electricity to its member cooperatives. Defendant MPS Generation, Inc., ("MPSG") is a North Carolina corporation principally located in Wilmington, North Carolina, and is licensed to do business in the State of North Dakota. Defendants Mechanical Plant Services of North Carolina, Inc., ("MPS") and Light Logix, Inc., are North Carolina corporations principally located in Wilmington. Defendant Lacy M. Henry is a resident of the State of North Carolina and is affiliated with MPSG, MPS, and Light Logix, Inc as either an owner or officer. Defendant Judy Henry, the wife of Lacy Henry, is a resident of the State of North Carolina, and purportedly an officer/director of MPS, MPSG, and Light Logix, Inc. Defendant Keith D. Henry, a son of Lacy Henry, is a resident of the State of North Carolina and purportedly an officer/director of MPSG, MPS, and Light Logix, Inc.

Prior to the fall of 2003, Northern Border Natural Gas Pipeline approached MPSG regarding the possibility of recovering waste heat from the pipeline and converting it to electricity. MPSG then contacted Basin Electric to inquire as to whether it would be interested in the project. MPSG and Basin Electric then began negotiations.[1] During the negotiation process and at MPSG's suggestion, MPSG and Basin Electric toured a facility in Canada that used equipment supplied by Ormat Equipment. Both parties thought the equipment would suit their project. Thus, the negotiations continued with the expectation that technical equipment supplied by Ormat would be used.

On or about November 5, 2003, Basin Electric and MPSG entered into a series of contracts. In the Engineering, Procurement, and Construction Contract ("EPC Contract"), MPSG agreed to design and construct for the benefit of Basin Electric four waste heat recovery generation systems. Pursuant to the EPC Contract, Basin Electric agreed to pay MPSG a total of twenty-eight million, nine hundred thousand dollars ($28,900,000) in accordance with a "milestone payment schedule." Basin and MPSG also entered into a contract (the "Operation and Maintenance Contract") whereby MPSG agreed to operate and maintain the four waste heat recovery systems governed by the EPC Contract. Several other contracts were executed to facilitate the construction and operation of the waste recovery systems. Sometime after the contracts between Basin Electric and MPSG were executed, MPSG entered into a relationship with Ormat, to supply equipment capable of producing a specified amount of megawatts.

On November 13, 2003, Basin Electric, MPSG, and Wells Fargo Bank of North Dakota, entered into an escrow agreement. The escrow agreement provides for the release of the funds held in escrow to MPSG to the extent MPSG performed its obligations under the EPC Contract within the established deadlines. In the event MPSG failed to perform its obligations, the funds were to be returned to Basin Electric to enable it to ensure the waste heat recovery systems were constructed in accordance with the EPC Contract. To date, Basin Electric has deposited two million, fifty-two thousand dollars ($2,052,-000.00) into the escrow account at Wells

---

1. According to the testimony and evidence presented to the Court, there were numerous "red flags" raised about the project early in the negotiation process including: skepticism expressed by Basin Electric's Chief Financial Officer and the United States Department of Agriculture's Rural Utilities Service, the lack of a performance bond or a letter of credit, the Defendants admitted financial troubles, and the need to form a new corporation solely to execute the EPC Contract.

Fargo Bank as required by the EPC Contract.

Throughout the next several months, MPSG submitted invoices for work completed in accordance with the milestone payment schedule. Basin Electric reviewed the invoices and paid MPSG pursuant to the payment schedule.[2] Problems began during the performance of milestone five when it appeared MPSG was having difficulties meeting the specifications for the Waste Heat Oil Heater (WHOH). A July 29, 2004, letter from Basin Electric representative Ron Rebenitsch to Kip Waddell at MPSG detailed the problem:

> As we have previously made you aware, Basin Electric Power Cooperative (Basin Electric) has had serious reservations about the design of the waste heat oil heater (WHOH). Therefore, to address these concerns, on July 27, 2004 engineers from Basin Electric and our subsidiary, Dakota Gasification Company (DGC), participated in two telephone conference calls with MPS Generation, Inc. (MPSG) and two WHOH vendors, ATS/Express LLC (ATS) and Heat Recovery Corp (HRC). MPSG has represented to us that ATS and HRC are experienced waste heat recovery heat exchanger manufacturers and Ormat had recommended both vendors for the Northern Border Cogeneration Projects. It is our understanding that the Ormat specifications provided to MPSG require a heat exchanger capable of transferring 99.3% of the available sensible heat in the Northern Border compressor/turbine exhaust gases to the oil loop. This level is unusually high. Basin Electric and MPSG agreed to consult ATS and HRC in an effort to clarify the safety,

maintenance and engineering consideration involved.

To summarize the information provided by ATS and HRC, both stated the proposed design requirements far exceed normal heat exchanger design. The proposed approach temperatures are much smaller than normal, while the gas exit design temperatures in certain cases do not maintain a level sufficiently above dew point to prevent condensation and subsequent corrosion.

Neither manufacturer had ever designed a heat exchanger at these extreme conditions, not could they recall any heat exchangers designed to these conditions. Both manufacturers noted the design would result in the potential for the exhaust gases crossing the dew point, which in turn would lead to corrosion. Since these heat exchangers will operate in gas turbine exhaust temperature far above the auto-ignition temperatures of the oil, corrosion of the oil-filed heat exchanger piping would result in a significant risk of subsequent leaks, which, in turn, could cause a serious fire.

Additionally, both manufacturers noted the high potential for considerable increased maintenance over the life of the heat exchanger, due to the proposed design. Since this equipment will be remotely located and operated, continued maintenance or an aggressive preventive maintenance plan is not an acceptable option. This equipment is expected to have 20–year or longer life expectancy, with minimum maintenance required. We understand that Ormat has proposed a cost of over $100,000 per year to guarantee the WHOH against the concerns we have raised. Such a high cost to

**2.** Basin Electric made the following wire transfers in conjunction with the completion of the first four milestones: November 13, 2003, $549,000; January 6, 2004, $910,350; March 2, 2004, $1,300,500; April 2, 2004, $1,300,500; for a total of $4,059,350. *See* Docket No. 19, Exhibit 8.

back up their own design only reinforced our concern about the high potential risks of this design.

Our discussion with these manufacturers corroborated the conclusions that our Basin Electric and DCG engineers had previously reached. Basin Electric cannot accept the proposed 99.3% heat recovery design of the WHOH. It is the consensus of Basin Electric's engineers the proposed design does not meet the contract requirements of "good engineering practices" (see EPC paragraph 2.12.A.2) and "safe, proper and continuous operation under all conditions described or implied in the Specifications, without undue strain, vibration, corrosion, or other operating difficulties" (see EPC paragraph 2.12.A.4).

An acceptable design for a WHOH must meet good engineering practice and must not result in flu-gas condensation during reasonably expected design conditions. A resubmitted design criteria for a WHOH that allows the maximum heat transfer, but which also meets good engineering practice, taking into account the acid dew point and approach temperatures, is expected form MPSG as soon as possible.

See Docket No. 19, Exhibit 2.

In spite of the problems encountered in accomplishing milestone five, Basin Electric allowed MPSG to proceed to milestone six "mobilization." MPSG has not submitted invoices for payment under either milestone five or six of the milestone payment schedule, and Basin Electric has not paid MPSG for any work completed pursuant to milestones five or six.

On February 8–9, 2005, Basin Electric formally gave notice to MPSG that it was terminating the EPC Contract under Article II, Section 3, which states:

Owner [Basin] shall have the right to cancel this contract for its convenience at any time by written notice to Contractor [MPSG]. On the date of such cancellation stated in said notice, Contractor shall discontinue all Work pertaining to this contract, shall place no additional orders and shall preserve and protect materials on hand purchased for or committed to this Contract. Upon such cancellation, Contractor shall be paid the earned portion of the total cost of all Work completed as of the date of cancellation, including the cancellation costs identified in any subcontract. Owner may, at its option, have those costs, which are reimbursable under this Section audited by either Owner's auditing staff or by independent certified public accountants selected by Owner.

See Docket No. 1, Exhibit 1.

Basin also demanded an audit of MPSG's records to determine how and where payments made to MPSG were applied and/or disbursed, relying on Article VI, Section 10, of the EPC Contract entitled "Records." To date, MPSG has not allowed Basin Electric to audit any of its records on the basis it has not compiled an invoice of the work completed as of the date of the cancellation.

After Basin Electric exercised its right to cancel the contract at its convenience, MPSG demanded that Wells Fargo Bank distribute the escrowed funds to MPSG, in accordance with Paragraph 3 of the Escrow Agreement, which provided as follows:

If Basin elects to terminate the EPC contract for its convenience pursuant to Article II, Section 3 of Contractor's Proposal, Basin shall provide written notice of such fact to the escrow agent by United States certified mail return receipt requested. Upon receipt of such notice, the escrow agent shall wire transfer funds in the escrow account to

MPSG in conformance with written instructions provided by MPSG.

See Docket No. 4, Exhibit A. After invoking the cancellation provision of Article II, Section 3, Basin Electric informed Wells Fargo Bank of its intent to file this lawsuit and directed Wells Fargo Bank to refrain from releasing the escrowed funds.

On February 24, 2005, Basin Electric filed suit alleging the Defendants had breached their contractual obligation in several ways. Basin Electric asserts it has directly paid MPSG $4,059,350[3] for its purported work on the EPC Contract to date and that virtually no work has been performed. Basin Electric also alleges that MPSG has not paid its subcontractors (primarily Perigon Architectural and Engineering Associates, P.A.) who were doing the bulk of the design and engineering work on the project. Basin Electric points to a judgment against MPSG issued by a state court in North Carolina in the amount of $292,474.16. *See* Docket No. 19, Exhibit 3. Basin Electric contends that it is unable to determine whether any of the money paid to MPSG to date was ever used for contract purposes.

MPSG asserts it has earned the payments pursuant to milestones one through four of the payment schedule. MPSG also contends that is was merely exercising its rights under the escrow agreement when it demanded payment from the escrow account. MPSG also notes that Basin Electric chose not to exercise it rights under Article V of the EPC Contract, which sets forth the default provisions agreed upon by the parties. Thus, MPSG contents that it has an absolute right to the monies held in the escrow account.

## II. LEGAL DISCUSSION

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, in determining whether a preliminary injunction should be issued, the Court must look to the specific facts shown by affidavit(s) to determine whether immediate and irreparable injury, loss, or damage will result to the applicant. In determining whether preliminary injunctive relief should issue, the Court is required to consider the factors set forth in *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). The Eighth Circuit summarized those factors as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Systems, Inc. v. C.L. Sys. Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556 (8th Cir.1993) *cert. denied* 512 U.S. 1236, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).

*Pottgen v. Missouri State High School Activities Association*, 40 F.3d 926, 929 (8th Cir.1994).

■ The burden of establishing the necessity of a temporary restraining order or a preliminary injunction is on the movant. *Baker Electric Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir.1994); *Modern*

---

**3.** At the hearing, Basin Electric noted it had miscalculated the total amount paid on the contract. Basin Electric's complaint alleged

$4,185,350 has been paid to MPSG pursuant to the contract. Basin Electric has amended this amount to $4,059,350.

*Computer Systems, Inc. v. Modern Banking Systems, Inc.,* 871 F.2d 734, 737 (8th Cir.1989) (*en banc*). "No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction." *Baker Electric Co-op.,* 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corporation v. Lenox Labs., Inc.,* 815 F.2d 500, 503 (8th Cir. 1987)).

## A. PROBABILITY OF SUCCESS ON THE MERITS

In its complaint, Basin Electric sets forth nine theories of relief: (1) breach of contract, (2) actual fraud/deceit, (3) constructive fraud, (4) conversion, (5) declaratory relief, (6) unjust enrichment, (7) injunctive relief, (8) piercing the corporate veil, and (9) implied trust under Section 59–01–06 of the North Dakota Century Code. In essence, Basin Electric asserts that MPSG has breached its contractual obligations to construct four waste heat recovery generation systems. According to Mark D. Foss, an employee of Basin Electric,

> To date, no waste heat recovery systems have been constructed for Basin by MPSG. Except for certain minor earth moving, no construction activity has occurred at any of the compressor station sites where waste heat recovery systems were to be constructed. Basin is unable to determine if any of the money sent to MPSG was ever used for contract purposes.

See Affidavit of Mark D. Foss, ¶ 18. Basin Electric alleges that MPSG failed to complete performance within fourteen months as contemplated by the contract, used monies in a manner other than that specified in the milestone payment schedule, incurred mechanics' liens by subcontractors, and refused to allow Basin Elec-

tric to audit its records. Basin Electric contends that each of these actions constitutes a breach of the contract.

MPSG contends that Basin Electric will be unable to succeed on the merits of any of its claims. MPSG asserts that Basin Electric has not produced any evidence to substantiate its allegations of fraud. MPSG characterizes the parties as sophisticated and experienced business entities who negotiated an arms-length business transaction. MPSG also contends that Basin Electric's conversion claim is without merit because the payments made to MPSG were made pursuant to the agreed-upon milestone payment schedule. MPSG acknowledges that a "legitimate contract problem" developed during the work on milestone five. However, MPSG argues that Basin Electric made the decision to invoke the cancellation provision, which in turn triggered MPSG's request for the escrow account funds. As to the mechanics' liens, MPSG states the liens were filed in the fall of 2004 and are from subcontractors who were working on milestone six "mobilization." MPSG reasons the mechanics' liens exist only because MPSG has not received payment from Basin Electric as per milestone six (mobilization), and thus, MPSG has been unable to pay the subcontractor who performed work pursuant to this milestone.

When evaluating a movant's "likelihood of success on the merits" the Court should "weigh the case's particular circumstances to determine whether the balance of equities so favors the movant that justice requires [intervention] to preserve the status quo until the merits are determined." *Minnesota Ass'n of Nurse Anesthetists v. Unity Hosp.,* 59 F.3d 80, 83 (8th Cir.1995). The Eighth Circuit has held that of the four factors to be considered by the district court in considering preliminary injunctive relief, the likelihood of suc-

cess on the merits is "most significant." *S & M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir.1992).

The parties spent a majority of the time at the hearing arguing the merits of the case and presenting evidence and testimony to support their respective theories. In support of its contract claims, Basin Electric asserted that MPSG failed to complete performance within fourteen months as contemplated by the contract, used monies in a manner other than that specified in the milestone payment schedule, incurred mechanics' liens by subcontractors, and refused to allow Basin Electric to audit its records.

■ There is no question that MPSG did not complete performance of the EPC Contract within fourteen months as contemplated. There is also no doubt that mechanics' liens have been filed against MPSG, although it is unclear whether these subcontractors were performing work related to milestones one through four or for milestone six. It is also unclear whether MPSG has used any of the monies received from the milestone payments to fulfill obligations to its subcontractors. Finally, there is no question MPSG has refused to allow Basin Electric to audit any portion of its records which relate to this contract. However, it is unclear from the evidence whether there are actually any business records of MPSG.

In spite of the defenses offered by MPSG, the Court finds that Basin Electric has established a sufficient likelihood of success on the merits of its contract claim at this stage of the litigation. The balance of equities strongly favor Basin Electric at this stage, and maintaining the status quo until the merits are determined is clearly the favored approach. Accordingly, the Court finds this factor weighs in favor of the issuance of a preliminary injunction.

## B. IRREPARABLE HARM

■ Basin Electric asserts that a preliminary injunction is necessary to avoid having the monies held in the escrow account turned over to the Defendants. Basin Electric contends that because the escrowed funds are to be released only upon the performance of work by the Defendants, it would be absurd to allow the monies to be disbursed given the allegations that the Defendants have failed to perform their obligations under the contract. Basin Electric also asserts that it has been unable to identify where the Defendants have spent more than $4,000,000 of funds paid to date by Basin Electric on this construction project. According to the unrefuted testimony at the hearing, Rob Rebenitsch of Basin Electric inquired of defendant Keith Henry where the money had gone and Henry responded by stating he did not know. Keith Henry was present at the hearing on March 16, 2005, and did not testify or in any manner refute this statement. Basin Electric had also inquired of Kip Waddell, MPSG's authorized agent who negotiated the EPC Contract, as to where the money had gone, and Waddell was also in the dark. Basin Electric presented evidence that Perigon Architectural and Engineering Associates, P.A. had recently obtained a judgment against MPSG in the amount of $292,474.16 for work performed on this nightmare project. See Docket No. 19, Exhibit 3. Surprisingly, CEO Lacy Henry was unaware of this judgment, which does not speak well for the company. Lacy Henry also acknowledged at least two other pending lawsuits against MPSG arising out of this project.

Basin Electric cites to the Eighth Circuit case of *Lynch Corp. v. Omaha Nat. Bank*, 666 F.2d 1208 (8th Cir.1981), as support for its assertion that it will suffer irreparable injury if a temporary restrain-

ing order is not issued. In *Lynch,* the Eighth Circuit held that a plaintiff had established the requisite "irreparable harm" necessary for the issuance of a temporary restraining order when the plaintiff showed that if he prevailed on the underlying claim he would be entitled to monies held in an escrow account.

The Court finds the *Lynch* case to be persuasive authority. Given the mechanics' liens filed on this construction project, a $292,000 judgment entered against MPSG in favor of the engineering firm involved in the project, and other pending litigation against MPSG, the Court finds there is a significant probability that if the monies held in escrow were released at this time to MPSG, such monies would likely be unavailable in the future should Basin Electric prevail on its claims. The Court further finds that Basin Electric has established that it would likely suffer irreparable harm if a preliminary injunction was not issued at this stage of the litigation. Therefore, this factor weighs in favor of Basin Electric.

## C. BALANCE OF HARM

■ Basin Electric asserts that its request for a preliminary injunction would not harm either party. MPSG contends Basin Electric had not met its burden regarding this factor. The Court finds that a preliminary injunction would maintain the status quo and would not create a hardship for either party. If it is determined at a later date that MPSG should prevail on the merits, the monies held in escrow would be released to MPSG plus interest which continues to accrue. On the other hand, if it is determined that Basin Electric should prevail on the merits and is entitled to damages, the monies held in escrow would be available and MPSG would not be harmed. To maintain the status quo at this stage is clearly the wise

and prudent approach to take. This factor weighs in favor of the issuance of injunctive relief.

## D. PUBLIC INTEREST

■ Finally, Basin Electric contends that the public interest weighs in favor of injunctive relief since the public has an interest in preventing and redressing the conduct allegedly engaged in by the Defendants. MPSG contends the public interest would be best served if this contract dispute was allowed to be litigated in the ordinary course without intervention by the Court in the form of injunctive relief.

The Court finds that the public interest would be best served by the issuance of a preliminary injunction at this stage of the litigation. This factor weighs in favor the issuance of a preliminary injunction.

## E. ESCROW AGENT

■ MPSG contends that the relief requested by Basin Electric does not comply with Rule 65(d) of the Federal Rules of Civil Procedure, in that Wells Fargo Bank is not a party to this action and thus, outside the scope of any injunctive relief. Rule 65(d) states, in part:

> Every order granting an injunction ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorney, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.

While it is true Wells Fargo Bank is not a party to this action, it is clear Wells Fargo Bank is either serving as an agent of both parties or acting in concert or participation with the parties through the escrow agreement. *See Regal Knitwear Co. v. NLRB,* 324 U.S. 9, 14, 65 S.Ct. 478, 89 L.Ed. 661 (1945) (holding an injunction "not only binds the parties ... but also those identi-

fied with them in interest, in 'privity' with them, represented by them or subject to their control"). Thus, the Court finds that a preliminary injunction prohibiting Wells Fargo Bank from releasing the monies held in an escrow account is within the scope of relief permitted by Rule 65(d).

## III. CONCLUSION

■ After having carefully considered the Complaint, the Motion for Preliminary Injunction, the briefs and accompanying exhibits of the parties, the testimony of Lacy Henry and Ron Rebenitsch, and the evidence presented at the hearing, the Court GRANTS the Plaintiff's Motion for a Preliminary Injunction. (Docket No. 3–2). The Court ORDERS that the Defendants be enjoined from receiving the funds currently held in the escrow account at Wells Fargo Bank in Bismarck, North Dakota. The Court ORDERS Wells Fargo Bank to retain the funds held in the escrow account pursuant to the terms of the escrow agreement until further Order of this Court.

The requirement for security under Rule 65(c) is waived. The United States Marshal Service is directed to serve a representative of Wells Fargo Bank North Dakota, N.A.

IT IS SO ORDERED.